THOMAS K. DOHERTY *vs.* RETIREMENT BOARD OF MEDFORD.

Middlesex. February 6, 1997. - June 5, 1997.

Present: WILKINS, C.J., LYNCH, O'CONNOR, FRIED, & MARSHALL, JJ.

*Practice, Civil,* Relief in the nature of certiorari. *Mandamus. Retirement. Public Employment,* Forfeiture of retirement benefits. *Police,* Hiring. *Statute,* Construction. *Constitutional Law,* Trial by jury. *Due Process of Law,* Hearing. *Words,* "Misappropriation of funds."

An action in the nature of certiorari is the appropriate vehicle for Superior Court review of a District Court proceeding under G. L. c. 32, § 16 (3) (*a*), reviewing a decision of a retirement board. [134-135]

The forfeiture of an employee's rights to a retirement allowance or to a return of accumulated retirement deductions mandated by G. L. c. 32, § 15, for misappropriation of funds of the governmental unit in which the employee worked, is remedial and not punitive inasmuch as it requires restitution only to the extent of the misappropriation: a former employee whose retirement deductions were forfeited under the statute was not entitled to a jury trial on the matter and the hearing he received before the retirement board under G. L. c. 32, § 16 (1), satisfied the demands of due process. [135-138]

Substantial evidence supported the determination of a retirement board proceeding under G. L. c. 32, § 16 (1), that a former municipal employee supplied his son with an advance copy of a 1983 police entrance examination and answers which the son then used fraudulently to obtain employment as a municipal police officer, and the board appropriately made a determination of the credibility of the evidence. [138-143] LYNCH, J., concurring.

A retirement board correctly concluded that a former municipal employee "misappropriat[ed] funds or property of a governmental unit" within the meaning of G. L. c. 32, § 15 (1), by providing a copy of a stolen police entrance examination to his son, intending that the son fraudulently obtain employment as a police officer, and enabling the son to obtain benefits and payments to which he would not otherwise be entitled. [143-145]

CIVIL ACTION commenced in the Somerville Division of the District Court Department on June 24, 1993.

CIVIL ACTION commenced in the Superior Court Department on March 10, 1994.

A motion to dismiss was heard by *Isaac Borenstein,* J., and,

after an amendment of the pleadings was ordered by him, the case was heard by *Judith A. Cowin,* J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John A. Baccari* for the plaintiff.

*Nicholas Poser* for the defendant.

FRIED, J. In a hearing before the retirement board of Medford (board), the plaintiff was found guilty of misappropriating funds from the city of Medford, pursuant to G. L. c. 32, § 15 (1), thereby losing his entitlement to recover retirement deductions accumulated during his years as a police officer. Both the District Court and the Superior Court judges upheld this decision. Doherty claims that the board's decision should be reviewed pursuant to a writ of mandamus; the board proceedings improperly deprived him of his right to a jury trial; the board's decision was unsupported by the evidence; and his actions did not constitute a misappropriation of funds. We transferred the appeal on our own motion and we affirm.

## I

Thomas K. Doherty was a police officer for the city of Medford from May 22, 1966, until September 4, 1985, when he was terminated following his conviction of two felonies in August, 1985. Doherty was sentenced to a term of from eighteen to twenty years for armed assault with intent to murder a former Metropolitan District Commission police officer, Joseph Bangs. See *Commonwealth* v. *Doherty,* 23 Mass. App. Ct. 633 (1987). While in prison, Doherty was tried as a codefendant in a Federal case involving multiple counts of conspiracy and RICO[1] violations arising out of a scheme ("Examscam") in which police officers stole and sold advance copies of police entrance and promotional examinations along with their answers.[2] Doherty was convicted on one count of general conspiracy and eleven counts of RICO violations. See

---

[1]Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

[2]Doherty played a central role in the scheme. In the Federal case, evidence was presented that, from 1977 to 1984, Doherty was involved in a type of partnership with a Metropolitan District Commission (MDC) police officer named Gerald Clemente in which the two of them stole advance

*United States* v. *Doherty*, 867 F.2d 47, 52 (1st Cir.), cert. denied, 492 U.S. 918 (1989).

On November 9, 1985, Doherty's wife, acting under power of attorney, submitted a written request to the board seeking a refund of Doherty's accumulated retirement deductions which had been withheld from Doherty's earnings during his tenure with the police department and were held by the Medford retirement system in its annuity savings fund. At the time of the request, these deductions totaled $25,404.93. After a period of delay, this refund request was renewed on December 3, 1992. In response, the board notified Doherty that it was going to consider the forfeiture of his deductions under G. L. c. 32, § 15 (2), and § 16 (1). The board based this potential forfeiture on the ground that Doherty had misappropriated the funds of the city of Medford, pursuant to G. L. c. 32, § 15 (1), by supplying his son, Michael Doherty, with an advance copy of the October, 1983, police entrance examination and answers which Michael then used "to fraudulently obtain employment as a City of Medford police officer" by obtaining a perfect score on the examination. Allegations to this effect had originally been brought in the Federal Examscam case, in which a jury found Doherty not guilty of the charge relating to his son Michael. The board's

copies of police examinations from the offices of the Massachusetts Department of Personnel Administration (MDPA). Over the course of the seven years, Doherty was involved in stealing and distributing advance copies of over twenty police promotional examinations. Doherty and Clemente would charge $3,000 an examination, which they then split between themselves. Doherty used these advance copies to assist himself in taking three exams, one of which resulted in his promotion to sergeant in 1979 and another of which facilitated his promotion to lieutenant in 1983. The scam ended in 1984, shortly after Doherty was involved in the shooting of Joseph Bangs, when police, searching Doherty's barn for evidence relating to the shooting, came across a copy of an April, 1984, examination. *United States* v. *Doherty*, 867 F.2d 47, 52-53 (1st Cir.), cert. denied, 492 U.S. 918 (1989).

We note that this evidence, in the Federal criminal prosecution, contrasts sharply with the claim made by Doherty's lawyer before the District Court in this case that "[t]here was no allegation whatsoever that Thomas Doherty had either the entrance exam, the Sergeants exam, or the Lieutenants exam. There was no evidence, other than the fact that he was legitimately promoted to lieutenant."

notice informed Doherty that he had a right to request a hearing on this matter.[3]

Prior to the hearing, Doherty objected on the ground that G. L. c. 32, § 15 (1), was unconstitutional because it allowed the board to direct a forfeiture of salary deductions without a civil jury verdict. The board's subsequent decision indicated that it had no jurisdiction to consider this claim and a hearing was held before the board as scheduled.

The hearing lasted two days. During that time, the board considered testimony given by prosecution witness Joseph Bangs in the Examscam case, as it was recorded in transcript volume 48 in the matter of *United States* v. *Doherty*, 675 F. Supp. 726 (D. Mass. 1987). Despite the fact that Doherty had been acquitted of providing his son with the 1983 entrance examination, the board found Bangs's testimony to be credible and sufficient, when considered in conjunction with Michael Doherty's testimony before the grand jury, to deny Doherty's application for a refund of his accumulated deductions. The board went on to determine that from January 6, 1987, through April 12, 1989, Michael Doherty was paid $157,050.55 for his services with the Medford police, charging Doherty with misappropriation of funds in this same amount. The board's certificate of decision was issued the same day on which the evidentiary hearing concluded.

Doherty appealed from the board's ruling to the District Court, which affirmed the board's decision. Seeking review, Doherty filed an action in the nature of mandamus in the Superior Court. The judge ordered that the complaint be

---

[3]General Laws c. 32, § 15 (1), provides, "Any member who has been charged with the misappropriation of funds or property of any governmental unit in which or by which he is employed or was employed at the time of his retirement or termination of service, as the case may be . . . and who files a written request therefor shall be granted a hearing by the board in accordance with the procedure set forth in subdivision (1) of section sixteen. If the board after the hearing finds the charges to be true, such member shall forfeit all rights under sections one to twenty-eight inclusive to a retirement allowance or to a return of his accumulated total deductions for himself and for his beneficiary, or to both, to the extent of the amount so found to be misappropriated and to the extent of the costs of the investigation, if any, as found by the board. He shall thereupon cease to be a member, except upon such terms and conditions as the board may determine."

amended to an action in the nature of certiorari.[4] Doherty's subsequent motion for summary judgment was denied by the Superior Court which went on to affirm the District Court. On appeal before this court, Doherty argues that (1) an action in the nature of mandamus is the correct vehicle for Superior Court review of a District Court proceeding under G. L. c. 32, § 16 (3) (*a*); (2) the provisions of G. L. c. 32, § 15 (1), deprived him of a jury trial in violation of his Federal and State constitutional rights; (3) the board's determination that Doherty had misappropriated funds was not supported by the evidence; and (4) it is not "misappropriation" under G. L. c. 32, § 15 (1), when a public employee provides his son with an advance copy of a police entrance examination with answers and, based on the results of his examination, the son is subsequently hired and paid a salary by the city of Medford.

## II

Doherty sought review of the board's decision in the District Court, pursuant to G. L. c. 32, § 16 (3) (*a*). This section provides that "[t]he decision of the court shall be final," and we have stated in the past that "certiorari is the only way of reviewing decisions declared final by statute." *MacKenzie* v. *School Comm. of Ipswich*, 342 Mass. 612, 614 (1961).

Doherty seeks review in the nature of mandamus, rather than certiorari, because, in his own words, "[t]he standard of review under G. L. c. 249, § 4 (certiorari), appears to be significantly less exhaustive than that standard under G. L. c. 249, § 5 (mandamus)." The Superior Court judge was correct in "order[ing] an amendment of the pleadings from a writ of mandamus to a writ of certiorari, in the interest of justice." We have resisted expansion of the application of mandamus proceedings and approved the common law rule "that mandamus is a remedy for [administrative] inaction and [is] not available where action has already been taken."

---

[4] Following this order by the Superior Court judge, Doherty submitted an amended complaint seeking certiorari review under G. L. c. 249, § 4.

General Laws c. 249, § 4, provides that "[a] civil action in the nature of certiorari to correct errors in proceedings which are not according to the course of the common law, which proceedings are not otherwise reviewable by motion or by appeal, may be brought in the supreme judicial or superior court."

*Reading* v. *Attorney Gen.*, 362 Mass. 266, 269 (1972), quoting *Rines* v. *Justices of the Superior Court*, 330 Mass. 368, 373 (1953). "It is well established that mandamus does not lie if any other effective remedy exists." *County Comm'rs of Middlesex County* v. *Sheriff of Middlesex County*, 361 Mass. 89, 90-91 (1972). See *Coach & Six Restaurant, Inc.* v. *Public Works Comm'n*, 363 Mass. 643, 644 (1973) (mandamus granted only "where there is no other adequate and effectual remedy"). The plaintiff makes no argument that an action in the nature of certiorari is unavailable in this case, but instead seeks a mandamus proceeding because the standard of review in such "appears to be de novo."

Both Doherty and the board agree that the appropriate standard of certiorari review is a "substantial evidence" standard, meaning "such evidence as a reasonable mind might accept as adequate to support a conclusion." *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981), quoting *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968). "Under the substantial evidence test, a reviewing court is not empowered to make a de novo determination of the facts, to make different credibility choices, or to draw different inferences from the facts found by the [agency]." *Pyramid Co.* v. *Architectural Barriers Bd.*, 403 Mass. 126, 130 (1988), quoting *Medi-Cab of Mass. Bay, Inc.* v. *Rate Setting Comm'n*, 401 Mass. 357, 369 (1987).

### III

Doherty argues that withholding his accumulated deductions pursuant to G. L. c. 32, § 15 (1), violates art. 12 and art. 15 of the Massachusetts Declaration of Rights because it does not provide for a hearing by a civil jury, but instead permits forfeiture if the board finds misappropriation of governmental funds or property.[5] Doherty bases this contention on the premise that G. L. c. 32, § 15 (1), is a penal statute, relying heavily on the fact that the statute speaks in terms of forfeiture. See *Commonwealth* v. *One 1972 Chevrolet Van*, 385 Mass. 198, 201 (1982) ("[f]orfeiture is punitive because it results in total loss of the property"). Because he

---

[5]Doherty also argues that this statute violates the Seventh Amendment to the Constitution of the United States. The Seventh Amendment is not applicable to the States. See *Commonwealth* v. *One 1972 Chevrolet Van*, 385 Mass. 198, 203-204 n.7 (1982).

construes the statute as penal, he concludes that it cannot be implemented by an agency of its own accord.

Article 12 deals primarily with criminal matters and provides that "no subject shall be . . . deprived of his property . . . but by the judgement of his peers, or the law of the land." We have never determined whether G. L. c. 32, § 15 (1), is penal in nature or not. See *Arruda* v. *Contributory Retirement Appeal Bd.*, 28 Mass. App. Ct. 366, 368 n.3 (1990) (leaving this issue open). We have applied art. 12 in other forfeiture cases and concluded that an individual was entitled to a jury trial. See, e.g., *Commonwealth* v. *One 1972 Chevrolet Van, supra.* Doherty notes that in *Collatos* v. *Boston Retirement Bd.*, 396 Mass. 684 (1986), we held that G. L. c. 32, § 15 (3A), which precludes an individual from receiving a retirement allowance or return of his deductions if he is convicted of specific statutory crimes, was a penal statute because it was "designed to enforce the law by punishing offenders, rather than simply by enforcing restitution to those damaged." *Id.* at 686.

Neither the fact that the statute employs the term "forfeit," nor our holding in *Collatos* regarding G. L. c. 32, § 15 (3A), determines the nature of G. L. c. 32, § 15 (1). The specific statutory violations which trigger § 15 (3A) affect public employees who have been convicted of participating in acts of extortion and bribery, and not employees who have been accused of misappropriating government property. The statute which concerns us, G. L. c. 32, § 15 (1), causes an individual to give up any benefits and deductions "to the extent of the amount so found to be misappropriated, and to the extent of the costs of the investigation, if any." Reviewing Doherty's claim that he was entitled to a jury trial on this matter, the Superior Court judge found that this statute was not penal or punitive but rather restitutionary in that it "permits restitution for the wrong done to the City of Medford by [Doherty]." Our holding in *Collatos*, which Doherty cites to bolster his argument, explicitly supports the Superior Court judge's ruling as it excludes those laws designed "simply [to] enforc[e] restitution to those damaged" from its definition of penal statutes. Unlike the situation we faced in *One 1972 Chevrolet Van*, we are not confronted with a statute "which is neither clearly remedial nor solely punitive." *Id.* at 200-201. This statute is clearly and solely remedial as it seeks only restitu-

tion. If an individual were forced to give up his claim to all retirement benefits and deductions regardless of the amount of his misappropriation, the excess of his forfeiture would be punitive. Under G. L. c. 32, § 15 (1), however, Doherty is deprived of no property that exceeds his misappropriation. In *Opinion of the Justices*, 423 Mass. 1201 (1996), the Justices noted the Supreme Court's holding that, "where a Legislature intends a statute to be remedial, it is penal only if 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the Legislature's] intention to establish a civil remedial mechanism." *Id.* at 1221, quoting *United States* v. *Ursery*, 518 U.S. 267, 278 (1996). The statute Doherty contests is not so punitive as to overcome its restitutionary purpose. See *Luk* v. *Commonwealth*, 421 Mass. 415 (1995) (suspension of driver's license is not penal because it serves nonpunitive purpose of advancing public safety).

Article 15 does not apply only to penal statutes or criminal matters, but states that "[i]n all controversies concerning property . . . the parties have a right to a trial by jury." We have acknowledged the broad language of art. 15, but we also note its exception: "except in cases in which it has heretofore been otherways used and practiced." As a result of this exception, the right to a jury does not apply to cases which traditionally would have fallen within the jurisdiction of a court of equity. *Dalis* v. *Buyer Advertising, Inc.*, 418 Mass. 220, 222 (1994). *Donaldson* v. *Boston Herald-Traveler Corp.*, 347 Mass. 274, 277 (1964). As the remedy of restitution under G. L. c. 32, § 15 (1), is equitable in nature, art. 15 does not require a jury trial here. *Nei* v. *Burley*, 388 Mass. 307, 315 (1983) (no right to jury trial where statute provides equitable relief). Moreover, although the Seventh Amendment does not apply to State civil proceedings, its jurisprudence is instructive as we have granted a similar interpretation to art. 15. *Commonwealth* v. *One 1972 Chevrolet Van*, *supra* at 619 n.5. In applying the Seventh Amendment right to a jury trial, the Supreme Court has noted that restitution is an equitable remedy which does not require a jury trial. *Tull* v. *United States*, 481 U.S. 412, 424 (1987). The Court also has repeatedly held the Seventh Amendment inapplicable to administrative proceedings "where jury trials would be incompatible with the whole concept of administrative adjudication." *Curtis* v. *Loether*, 415 U.S. 189, 194 (1974), citing *NLRB* v. *Jones &*

*Laughlin Steel Corp.*, 301 U.S. 1 (1937), in which the Court upheld an award of back pay pursuant to an unfair labor proceeding before the NLRB without a jury. See *Pernell* v. *Southall Realty*, 416 U.S. 363, 383 (1974).

While an agency that exercises adjudicatory powers is constrained by the demands of due process, *Moody* v. *Weymouth*, 805 F.2d 30, 32-33 (1st Cir. 1986); G. L. c. 32, § 15 (1), the board granted Doherty the right to a hearing under G. L. c. 32, § 16 (1), at which he was permitted to present evidence, cross-examine, and seek judicial review, thus satisfying the demands of due process. No more was required.

## IV

Since review is in the nature of certiorari, we, like the courts below, must determine whether the board's decision was supported by substantial evidence. In finding Doherty "responsible for providing an advance copy of the October 1983 entrance examination and answers for the City of Medford Police Department to his son," the board relied primarily on the testimony of Joseph Bangs, contained in one volume of the transcript of the Examscam trial in the Federal District Court.[6] Although the board acknowledged the fact that Doherty had been acquitted of this charge in the Federal criminal case, it stated simply that it "[found] that the testimony of Joseph Bangs . . . is credible," noting that "[n]o testimony or evidence has been offered in the instant case to rebut the facts of Mr. Bangs' testimony." The board went on to find Doherty guilty of misappropriating "the funds or property of a governmental unit."

At the Federal trial, Bangs testified that Doherty had invited Bangs into his home two days before Doherty's son, Michael, was to take the police entrance examination. Bangs testified that he met with Doherty in the basement of Doher-

---

[6]The board also considered a portion of this volume of the transcript which contained a recitation of Michael Doherty's testimony before a Federal grand jury prior to the Federal trial. In that testimony, Michael stated that he did not prepare for the entrance examination he took in 1983, did not review any materials prior to taking the examination, and did not participate in any preparation courses or exercises. He denied having seen an advance copy of the examination or having participated in any conversations with his father or Bangs regarding his preparation for the examination. He acknowledged that he had attained a perfect score on the examination.

ty's home and that Doherty showed him a copy of an entrance examination, at which time Bangs was able to observe several advance copies of the examination, along with an attached answer sheet, on a coffee table. According to Bangs's account, Doherty yelled upstairs for his son to join them and asked Bangs to tell Michael "the best way to . . . take this exam." Bangs said that he told Michael "to memorize the exam and if he had any problems . . . to write it on a small piece of paper or on the palm of his hand." Bangs said that both he and Doherty encouraged Michael to make sure he scored one hundred percent on the examination in order to assure his acceptance to the police force.

While Doherty did not present any evidence before the board that would directly contradict or deny the facts contained in Bangs's account of this alleged meeting, Doherty vigorously objects to the board's acceptance of Bangs's story, arguing that the board ignored vital cross-examination testimony contained in the transcript which demonstrated Bangs was not a reliable witness. Specifically, Doherty points to the fact that on the first day of the hearing before the board (March 30, 1993), the board's counsel introduced only selected portions of the trial transcript which did not contain Bangs's cross-examination testimony. In order to place the testimony in context, Doherty's attorney submitted a complete copy of the relevant transcript, on the second and final day of the hearing, which took place almost two months later on May 25. The board's decision, in which it declared Bangs to be a credible witness, was dated and signed the same day the hearing concluded, a fact which Doherty uses to bolster his claim that the board improperly disregarded his proffered impeachment evidence.

The indications of witness bias which Doherty asks us to consider in this case are certainly impressive. As noted above, Doherty had been involved in a shooting in 1984 which led to his conviction for the attempted murder of Bangs. Prior to a falling out which led to this shooting, Bangs and Doherty had purchased a condominium unit together in Florida. Although both contributed equal amounts to the purchase price, the title was entered in Doherty's name alone, at Bangs's insistence. Following the shooting, Doherty added insult to injury by transferring this property, without Bangs's approval, to obtain funds to pay his defense counsel in the charges aris-

ing from his participation in the attempt to kill Bangs. On cross-examination, Bangs admitted that he had told others that Doherty was making a fool out of him and had stated that he "wanted to get" Doherty's brother, girl friend, son, and anyone associated with Doherty. He had also told others that his cooperation in the Federal case was conditioned on the authorities pursuing Doherty's son Michael. Doherty also relies on evidence of Bangs's bad character which came out on cross-examination, placing heavy emphasis on the fact that Bangs was a frequent cocaine user and that Bangs personally conceded that he had been "a major drug trafficker." According to his own statements on cross-examination, Bangs had trafficked in approximately 25,000 pounds of marihuana between 1982 and 1984, had trafficked in cocaine on twelve to fifteen different occasions, was engaged in the collection of illegal loans, had been involved in a robbery of Depositors Trust in Medford, and had been involved in two breaking and enterings in 1981. Bangs acknowledged that, in exchange for his testimony against Doherty and other former associates, he was not being prosecuted for any of these activities, despite the fact that some of the drug deals occurred after Bangs entered his agreement to cooperate with the authorities. On the contrary, Bangs had been able to obtain the return of several pieces of property from the authorities, which normally would have been subject to forfeiture, and had been allowed to charge many living and even entertainment expenses to the government, in exchange for his cooperation. Bangs acknowledged his awareness that he "had a pretty good deal going."

Although Doherty was acquitted on this charge relating to his son, Michael, in the criminal trial, this presents no bar to civil proceedings addressing the same facts, since civil repercussions require a lower standard of proof. See *Commissioners of Civil Serv.* v. *Municipal Court of the Brighton Dist.*, 369 Mass. 166, 173-174 (1975), cert. denied sub nom. *Patuto* v. *Commissioners of Civil Serv.*, 429 U.S. 845 (1976); *Fire Comm'r of Boston* v. *Joseph*, 23 Mass. App. Ct. 76 (1986). Nor is the fact that the board heard no live testimony of any consequence, as an administrative agency may rely on transcripts obtained from prior trials, so long as those transcripts bear "reasonable indicia of reliability." *Embers of Salisbury, Inc.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 526, 530 (1988); *Dolphino Corp.* v. *Alcoholic Beverages*

*Control Comm'n,* 29 Mass. App. Ct. 954, 955 (1990); *Arruda* v. *Contributory Retirement Appeal Bd.,* 28 Mass. App. Ct. 366, 369 (1990). The fact that Doherty had the same interest in refuting Bangs's testimony in the Federal case and had the opportunity to cross-examine his statements satisfies this requirement. Aside from requesting the board to consider the entire volume of transcript, rather than selected portions of it, Doherty did not object to the introduction of this evidence and did not request that any live witnesses be heard.

As noted above, under the substantial evidence test, this court is not authorized "to make a de novo determination of the facts, to make different credibility choices, or to draw different inferences from the facts found by the [agency]."[7] *Pyramid Co.* v. *Architectural Barriers Bd., supra* at 130, quoting *Medi-Cab of Mass. Bay, Inc.* v. *Rate Setting Comm'n,* 401 Mass. 357, 369 (1987). Although Bangs may have been a man of unsavory character, and his cross-examination testimony reveals strong indication of bias, the board was entitled to find his account of the October, 1983, meeting credible. While Bangs may have had an incentive to fabricate his testimony, "[t]his contention . . . goes to the credibility of and the weight to be given such testimony . . . and we cannot say, as matter of law, that [Bangs's] testimony was insufficient to support the [board's] findings." *Embers of Salisbury, Inc.* v. *Alcoholic Beverages Control Comm'n, supra* at 530. Issues of

---

[7]In his brief, Doherty argues what he admits is a "novel proposition," in which he contends that the reviewing courts should have made their own assessments of the impeachment evidence against Bangs since it was all based on a dry transcript, thus placing the reviewing courts in the same position as the board to evaluate credibility. While this argument has some logical appeal, we have been careful to honor the substantial evidence standard when reviewing similar agency decisions in the past. The agency's decision in *Embers of Salisbury* v. *Alcoholic Beverages Control Comm'n,* 401 Mass. 526 (1988), was also based on a dry transcript, but we scrupulously honored the agency's determinations of credibility. Even in those cases in which the substantial evidence standard has led us to question an agency's choices regarding credibility, we have typically remanded decisions to the respective agency for further consideration or explanation of the credibility matter, rather than engaging in such a determination ourselves. See *Herridge* v. *Board of Registration in Medicine,* 420 Mass. 154, 167 (1995), *S.C.,* 424 Mass. 201 (1997); *Bettencourt* v. *Board of Registration in Medicine,* 408 Mass. 221, 222 (1990). But see *Herridge* v. *Board of Registration in Medicine,* 424 Mass. 201, 206 (1997) (vacating board's decision after board failed to explain its credibility determinations as previously instructed by this court).

credibility are left to the board to resolve, *Friedman* v. *Board of Registration in Medicine*, 408 Mass. 474, 477 (1990), cert. denied, 498 U.S. 1107 (1991), as the District Court and Superior Court recognized. This is so even if the reviewing court would have come to a different conclusion, had it been reviewing the matter de novo. *Embers of Salisbury*, *supra* at 529, quoting *School Comm. of Wellesley* v. *Labor Relations Comm'n*, 376 Mass. 112, 120 (1978). This is not a case in which Doherty contests Bangs's account of the facts by presenting his own version of the events of October, 1983. All Doherty seeks to do is to discredit Bangs's truthfulness. Cf. *Salem* v. *Massachusetts Comm'n Against Discrimination*, 404 Mass. 170, 174 (1989) (testimony of witnesses at hearing conflicted on multiple issues of material fact). Just as in *Embers of Salisbury*, a case in which we reviewed an agency's decision which relied on a transcript from a criminal trial at which the witness had an incentive to lie, Bangs's testimony, "if believed, amply supports the [board's] findings, and it is the [board], not this court, which is 'the sole judge of the credibility and weight of evidence before it during the administrative proceeding.' " *Id.* at 529, quoting *Number Three Lounge, Inc.* v. *Alcoholic Beverages Control Comm'n*, 7 Mass. App. Ct. 301, 309 (1979).

Doherty contests the board's holding on the ground that it issued its decision on the same day it received the entire transcript and concluded the evidentiary hearing. We are not willing to fault the board for its promptness by accepting Doherty's proposition that this fact alone shows the board improperly disregarded the cross-examination evidence Doherty introduced. By statute, the board is required to file its decision within fifteen days of the close of its hearing. G. L. c. 32, § 16 (2). In addition to admitting the rest of the relevant volume of the transcript, which would not have taken much time to review, the board heard extensive oral argument presented by Doherty's counsel regarding the content of Bangs's cross-examination testimony. The board's decision was quite short, consisting of approximately three pages. Doherty's reliance on *Bettencourt* v. *Board of Registration in Medicine*, 408 Mass. 221 (1990), is misplaced. In that case we censured an agency for declaring findings and conclusions that were arbitrary and unsupported by the evidence presented at the hearing. *Id.* at 227. In contrast, the transcript of

Joseph Bangs's testimony, which the board chose to believe, provided sufficient evidence to support the board's finding that Doherty had provided his son with an advance copy of a police entrance examination.

## V

Concluding that Doherty did provide Michael with a copy of and the answers to this examination, the board found that Doherty had "misappropriated the funds or property of a governmental unit," such misappropriated funds consisting of "the salary and other payments received by Michael Doherty from the City of Medford by virtue of his fraudulently obtained employment as a police officer." Doherty's final contention is that, assuming he did provide an advance copy of the entrance examination to his son, this did not amount to a "misappropriation" of funds under G. L. c. 32, § 15 (1).

Doherty offers *Arruda* v. *Contributory Retirement Appeal Bd.*, 28 Mass. App. Ct. 366 (1990), in support of his contention that this was not misappropriation. In *Arruda*, the Appeals Court found misappropriation under G. L. c. 32, § 15 (1), when an employee of the Fall River Housing Authority (FRHA) participated in a scheme of bribery in which he approved excess payments by the FRHA to a contractor, which payments then provided kickbacks to himself and others. *Id.* at 368-369. Doherty focuses on the fact that Arruda caused his employer to expend *excess* funds that would not otherwise have been disbursed, noting that there were no allegations "that the scheme to distribute stolen exams resulted in the generation of excess payments" or that the scheme increased the budgetary expenses of the Medford police department. Misappropriation is not limited to excess payments wrongfully extracted from an entity. Rather, misappropriation is commonly defined as "[t]he unauthorized, improper, or unlawful use of funds or other property for purposes other than that for which intended." Black's Law Dictionary 998 (6th ed. 1990). See *Arruda, supra* at 369 (misappropriation covers funds which are "wrongly appropriated or misapplied"). When one wrongfully diverts public funds to an improper source or recipient, it does not matter that the budgetary expenditure was validly anticipated at the outset, or would have been the same had the money been directed to the right person or entity. Likewise, it is irrelevant that the

property or money was misappropriated not for one's own wrongful use, but the wrongful use of another. Just as an officer who used a stolen promotional examination wrongfully to obtain for himself a promotion and a higher salary could be found to have misappropriated government funds to the extent of his fraudulently obtained pay increase, see Rep. A.G., Pub. Doc. No. 12, at 35 (1990), so Doherty can be held responsible for misappropriation by causing similar payments to be made to his son.[8]

In a similar vein, it is no answer to the board's conclusion that Medford received services when it employed his son. See *United States* v. *Allard*, 926 F.2d 1237, 1242 (1st Cir. 1991) (no defense that hospital received valuable services when intern misrepresented qualifications as part of scheme to deceive hospital into hiring him).[9] This justification ignores the fact that the city did not get what it intended. At the time Michael Doherty took the police entrance examination, sixteen examinees were hired: ten, including Michael, who received a perfect score, and six others who achieved near-perfect scores but had veteran status which provided them with priority in the hiring process. Bangs testified that both he and Doherty counseled Michael that because he had no military service in his background, it would be necessary for him to achieve a perfect score if he were to be hired. In hiring Michael Doherty, the city intended to hire a police officer who had validly outperformed other candidates vying for the position and who had achieved his or her score honestly. Doherty's action in respect to the entrance examination was

[8]Doherty makes an additional argument that if he is found guilty of misappropriation, Michael should likewise be held responsible for misappropriating funds from the city of Medford. Because Doherty is aware of no such proceedings against his son to recoup the $157,050.55 Michael received from the city, Doherty contends that he should not be asked to repay the city. This argument accomplishes nothing for Doherty as we are not examining what types of action could be brought against Michael, but rather Doherty's liability under the provisions of G. L. c. 32, § 15 (1). Because this statute is restitutionary and not penal, the city could not use this provision to obtain repayment in excess of the total amount misappropriated.

[9]This situation is also analogous to situations in which an individual involved in the unauthorized practice of law has been required to disgorge any fees he received for such unauthorized services. See *In re Ray*, 675 A.2d 1381, 1389 (D.C. 1996); *Unauthorized Practice of Law Comm.* v. *Prog*, 761 P.2d 1111, 1116 (Colo. 1988).

necessary to and led directly to the payments the city then made to his son. He obtained an advance copy of the October, 1983, police entrance examination, provided his son with a copy and its answers, thereby enabling Michael to obtain benefits and payments from the city, to which he would not otherwise be entitled.

Under the dictates of G. L. c. 32, § 15 (1), an individual who is found to have misappropriated the "funds or property of any governmental unit in which . . . he . . . was employed" cannot recover his deductions "to the extent of the amount so found to be misappropriated." Having engaged in a misappropriation of governmental property which caused and was intended to cause a misappropriation of funds, Doherty has relinquished all rights to his deductions insofar as his misappropriations exceed the value of his deductions.

The judgment of the Superior Court is affirmed.

*So ordered.*

LYNCH, J. (concurring). I write separately because of the court's reliance on *Embers of Salisbury, Inc.* v. *Alcoholic Beverages Control Comm'n,* 401 Mass. 526 (1988), in which I dissented. If credibility is to be resolved on the basis of a dry transcript, a doubtful proposition at best, then appellate judges are in as good a position to make that determination as is the tribunal from which the matter is being appealed. Because the court has rejected the views I expressed in *Embers of Salisbury, Inc.*, I see no reason to contest further except to note the remarkable efficiency of the board here — that was able to review the transcript of the significant portions of the criminal trial and, in a matter of hours, reach a conclusion at odds with the fact finders who made their decision on the bases of live testimony and cross-examination, and after a complete trial presided over by an impartial judge.