Fabricant, J.
INTRODUCTION
This is an action for review in the nature of certiorari, pursuant to G.L.c. 249, §4, of a decision of the Framingham Conservation Commission denying the plaintiffs application for an order of conditions to build a single family home on land within the 125-foot wetlands buffer zone established by Framingham ByLaw. After hearing, and review of all materials submitted, including the transcript of the hearings before the Commission, for the reasons that will be explained, the Court concludes that the Commission’s decision must be reversed.
*536 BACKGROUND
The plaintiff is the owner of a lot on Arnold Road in Framingham. The lot borders on an area designated by the Town as a bordering vegetative wetland, including a vernal pool that has been certified as a habitat for wood frogs. On September 1, 1999, the plaintiff submitted to the Framingham Conservation Commission a Notice of Intent to construct a single-family home on the lot. The application informed the Commission that the proposed project would involve construction within the 125-foot buffer zone established by town by-law. Although the construction itself would be outside the 100-foot buffer zone established under the state Wetlands Protection Act, G.L.c. 131, §40, some clearing and planting for the yard would be within the state’s 100-foot buffer zone; accordingly, the plaintiff sought an order of conditions under both state and local law.
The Commission scheduled a public hearing on the application for September 15, 1999. The plaintiff appeared at the hearing, accompanied by his representative, Tim Paris of Cornerstone Engineering. Paris presented the plan for the project, explaining the location of the house on the lot, and the provisions that had been made for a swale to direct water flow from the house away from the vernal pool, so as to avoid contamination. A member of the Commission expressed concern that the swale would deprive the vernal pool of needed water. An abutter expressed general concern for preservation of the vernal pool, with its wildlife and plant life. The Commission voted to continue the hearing until October 6, 1999, so as to give the plaintiff an opportunity to have the lot staked to show the location of the proposed construction, as well as to provide certain requested information regarding an easement on the property and compliance with zoning requirements.
On October 6, 1999, Paris again described the plan, this time informing the Commission that the swale had been removed in response to the concern expressed at the last hearing. He provided documentation addressed to the other issues raised, including provision for a “no-cut zone" adjacent to the pool area. At this point, a member of the Commissioner raised a question regarding “(w]hat is that minimum amount of forested area surrounding a vernal pool that’s required to insure . . . that it’s viable.” Paris responded to the effect that “I don’t think there’s a magic number . . . you’d have to take it on a case by case basis.” The member then expressed general opposition to “approving any proposed development within the buffer zone of a vernal pool,” noting that any such development would be “inviting what we’ve seen happen at Shopper’s World.” The Commission chair, claiming “a fair amount of expertise in this area,” asserted that “(s)tudies have shown that these critters migrate 600 meters, 700 meters from their birth pool,” so that “we just have to keep every piece of undeveloped land that is surrounding vernal pools within the jurisdiction.” She suggested that “you can get the experts out there . . . and they can do an evaluation and find out the migration routes ... of the species that are there.” Two abutters then expressed concern about tree removal and resulting erosion into the vernal pool.[1]
The Commission then considered a motion to approve an order of conditions. In discussion, a commissioner again cited Shopper’s World, referring to “the death of that vernal pool,” commenting that “although we did keep the full 125-foot Framingham buffer zone as a no disturb zone, around that, that wasn’t enough.” On that basis, and because “(h)ere we’re looking at critters that travel 6 or 8 hundred meters,” he declared that “I can’t in clear conscience vote for any development within the 125-foot jurisdictional area.” A second commissioner objected to the comparison with Shopper’s World, citing the “variety of reasons why . . . the vernal pool failed there.” Noting the absence of data, he suggested that “if this requires a study then maybe that’s something we should consider.” Another commissioner suggested that “(i]f this motion carries, I would like with this motion to be a study put on this vernal pool to find out the crucial areas and to do whatever is necessary to protect those areas.” The Commission then voted against the motion to issue an order of conditions approving the project.
At this point, a member of the Commission moved to “commission a study of this vernal pool and this site and ask our experts to give us two answers. One, what is the appropriate distance in order to protect this vernal pool, and on that particular site and the second question would be, what is an appropriate distance in general for the protection of vernal pools . . . And part of my motion would be that we bear that expense since we would be reaping the benefits and you’d be free to hire your own expert if you question the findings.” Discussion ensued regarding the costs of such a study, the Commission’s lack of funds, and the usual practice that “whenever we incur costs we usually ask the applicant to incur the costs.” No member seconded the motion, and it failed to carry. A member then moved to “close the hearing denying the project based on its proximity to the certified vernal pool and because the upland area surrounding this vernal pool is so limited already by the development on these three sides of it.” This motion, too, failed for lack of a second.
At this point, a member asked the plaintiff “(h]ow do you feel about conducting a study and bearing that.” In response, the plaintiff referred to the investment he had already made, and commented that “I’m wondering are there any studies out there that are available now without going to another study.” After some discussion of the nature, costs, and implication of such a study, the plaintiff stated that “I want to look into it and find out what these costs are.” After further discussion, the Commission voted to continue the hearing again, this time until October 29, 1999.
*537 On that date, the plaintiff was accompanied by George Connors of Cornerstone Engineering. Connors submitted, and summarized, a written report addressing the issue of “the impacts the proposed construction might have on the vernal pool habitats’ surrounding terrestrial land.”[2] Based on his review of the vernal pool certification, and his examination of the site and of the proposed project, particularly the steepness of its slope, the proportion of the lot that would remain undisturbed, and the provisions made for drainage, Connors concluded that the project would not alter the vernal pool or the wildlife habitat. Connors noted also information from published sources regarding the habits of wood frogs, and observed that their preferred “moist microhabitat” does not presently exist on the steeply sloping lot. Accordingly, he concluded, “(i]t is unlikely the buffer zone alterations would affect the creatures” and that “[s]ince the terrestrial area is not extensively used by the identified vernal pool species the house construction should not affect upland habitat.”
In discussing Connors’s presentation, members of the Commission referred to publications reflecting wood frogs’ use of “upland forested areas,” and expressed concern that the project would reduce the availability of such areas. One member stated that “our precedence here in Framingham has been when there’s vernal pools, that the whole, the 125-foot by-law, buffer zone, is the no-disturb zone. And even with that, where we’ve allowed woodland beyond that to be taken and developed, [it] essentially has resulted in the demise of the vernal pool.” Comments from abutters, and further discussion among members of the Commission, led to renewed focus on the perceived need for “some kind of study, not necessarily specific to this site to determine how much of an area is necessary.’’[3] Accordingly, a member moved “that we pursue at least an inquiry into conducting some kind of an evaluation of vernal pools in this area and what kind of buffer is necessary to protect them.” This motion, like the earlier ones on the same subject, failed for lack of a second. There followed a motion to deny the application “based on proximity to the vernal pool and the wetland area.” This motion, too, failed for lack of a second. A motion was then made to close the hearing and issue an order of conditions at the next meeting. That motion carried by a vote of three to two.
At the next meeting, on November 3, 1999, a member of the Commission reported that he had “looked on the internet under vernal plus pool plus habitat and advanced search requiring all three of those appeared and I had 351 records,” and that “a couple hundred more” appeared under "wood frogs.” He referred to excepts indicating, as he reported, that “they travel a lot farther away than the proposed house is from there.” Based on this research, he concluded that “if any of these reports said cut a little bit of forest near this vernal pool, it doesn’t really matter if you cut that, I think we’d have it here in front of us. I think the applicant’s engineer would have found that information ...” Accordingly, he moved to deny the project based on “its impact on the forested upland area,” as well as the “hemmed in” nature of the lot. The motion was seconded, and then carried by a vote of three to one, with two abstentions.
The Commission’s written decision issued on November 18, 1999. The reasons given, noticeably different from those cited in the motion, were as follows:
The Commission has denied this application because, the applicant did not supply requested information. The Commission at its October 6th hearing requested a Wildlife Habitat Study on the Vernal Pool to evaluate what wildlife was present and what impact the proposed home would have. The applicant came back with a habitat evaluation at the Oct. 20th hearing which did not supply the needed information. Commission members supplied ample information showing that vernal pool species need upland habitat after breeding in the pool even beyond Framingham’s 125 buffer zone. The Commission also felt that the upland habitat surrounding this vernal pool was already compromised by the existing sub-division, the Mass. Pike, and Grove St. which was moved closer during construction of the Pike. The applicant agreed to closing the hearing even though he knew the Commission was lacking information. The Commission offers the following attached documentation to support its decision.
Attached was a single page consisting apparently of excerpts from publications regarding the importance of buffer zones.
The plaintiff sought review of the Commission’s decision, insofar as it related to the state Wetlands Protection Act, by filing an application with the Department of Environmental Protection for a superseding order of conditions. The DEP allowed that application in a decision dated June 30, 2000, concluding that “the buffer zone does not contain . . . 'wildlife habitat’ ” as defined in the Wetlands Protection Act and regulations thereunder, “and thus the proposed project will not alter actual ‘wildlife habitat’ ” as defined in the DEP’s regulations. No party sought judicial review of that decision.
With respect to the Commission’s decision under the Town by-law, the plaintiff sought judicial review through this action, filed on December 9, 1999.[4] The Town filed the record of its proceedings on February 17, 2000, and the plaintiff filed his motion for judgment on the pleadings, with opposition, on January 4, 2002.[5] The Town thereafter, with leave of court, supplemented the record by submitting a transcript of the Commission’s proceedings, along with a supplemental memorandum in opposition to the motion, which the Court has considered.
*538 DISCUSSION
Review in the nature of certiorari is available of judicial or quasi-judicial proceedings where no other form of review is available and review is necessary to correct a substantial injury or injustice arising from the proceeding at issue. See Walpole v. Secretary of Executive Office of Environmental Affairs, 405 Mass. 67, 72 (1989); Warren v Hazardous Waste Facility Site Safety Council, 392 Mass. 107, 117 (1984). A proceeding is quasi-judicial when it determines individual rights or interests, as opposed to political or legislative matters. See e.g. Warren v. Hazardous Waste Facility Site Safety Council, 392 Mass. at 117 (certiorari review not available because determination that proposal to locate hazardous waste site was feasible and deserving of state assistance was political in nature); Moskow v. Boston Redevelopment Authority, 349 Mass. 553, 570 (1965), cert. den., 382 U.S. 983 (1966) (certiorari review not available because approval of urban renewal plan was political); Lucia v. Water & Sewer Commissioners of Medford, 332 Mass. 468, 470 (1955) (rate-making is legislative function not subject to certiorari review). Certiorari is available to review an administrative board’s application of criteria established by rule or statute, after a hearing required by law, but is not available with respect to wholly discretionaiy decisions as to which no rule or law entitles any affected party to a hearing. See, e.g., Walpole v. Secretary of Executive Office of Environmental Affairs, 405 Mass. at 72-73 (certiorari review not available where approval of siting of sludge disposal facility was wholly discretionaiy and did not require hearing); School Committee of Hatfield v. Board of Education, 372 Mass. 513, 516-17 (1977) (certiorari review not available where denial of school building assistance funds was wholly discretionary, without standards for determining eligibility other than “best interest of the town”); Kern v. Personnel Administrator, 28 Mass.App.Ct. 938, 939-40 (1990) (certiorari review not available of discretionary administrative decision not to request expedited procedure for appointment from eligibility list).
The standard for certiorari review varies according to the nature of the action of which review is sought. Forsyth School for Dental Hygienists v. Board of Registration in Dentistry, 404 Mass. 211, 217 (1989); FIC Homes of Blackstone, Inc., v. Conservation Commission of Blackstone, 41 Mass.App.Ct. 681, 684 (1996) (1997). Where an administrative board has broad discretion to determine whether to an grant exemption from its regulations, the Court’s review is limited to determining whether the decision is arbitrary or capricious or an abuse of discretion. See T.D.J Development Corp. v. Conservation Commission of North Andover, 36 Mass.App.Ct. 124, 129 (1994); Forsyth School for Dental Hygienists v. Board of Registration in Dentistry, 404 Mass. at 217 & n.2. A decision is not arbitrary or capricious unless “there is no ground which ‘reasonable [persons] might deem proper’ to support it.” FIC Homes of Blackstone, Inc., v. Conservation Commission of Blackstone, 41 Mass.App.Ct. at 685, quoting T.D.J. Development Corp. v. Conservation Commission of North Andover, 36 Mass.App.Ct. at 128. A decision that is based on a legally untenable ground, or on factors that are irrelevant under the governing law, is arbitrary. Id. at 218; see Faffard v. Conservation Commission of Reading, 41 Mass.App. Ct. 565, 568 (1996) (“[i]f the agency has acted for reasons that are extraneous to the prescriptions of the regulatory scheme, but are related, rather, to an ad hoc agenda, then that agency has acted arbitrarily”); see also FIC Homes of Blackstone, Inc., v. Conservation Commission of Blackstone, 41 Mass.App.Ct. at 684.
When a statute or regulation governing administrative action refers to a broad standard, rather than specifying narrow and objective criteria to be applied, judicial review does not extend to assessing the strength of the evidence supporting the action. See Caswell v. Licensing Commission for Brockton, 387 Mass. 864, 878 (1983); Goldie’s Salvage, Inc. v Board of Selectmen of Walpole, 31 Mass.App.Ct. 726, 731 (1992); Yeradi’s Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen of Randolph, 19 Mass.App.Ct. 296, 300 (1985). Where, however, a decision is based on factual findings, the Court may consider the evidentiary basis for those findings, since a decision based on facts not supported by substantial evidence is arbitrary and capricious. See generally Doherty v. Retirement Board of Medford, 425 Mass. 130, 135 (1997) (applying substantial evidence standard to review of retirement board decision imposing forfeiture of contributions); Konstantopoulos v. Whately, 384 Mass. 123, 136-37 (1981) (applying substantial evidence test to review of revocation of entertainment license). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. Doherty v. Retirement Board of Medford, 425 Mass. at 135, quoting New Boston Garden Corp. v. Assessors of Boston, 383 Mass. 456, 466 (1981). In considering whether substantial evidence supports the facts found, the Court must examine the entire record and take into account whatever fairly detracts from the weight of the conclusion reached. Doherty v. Retirement Board of Medford, 425 Mass. at 141-42; Pyfrom v. Commission of Department of Public Welfare, 39 Mass.App.Ct. 621, 624 (1996). The Court may not, however, substitute its judgment for that of the administrative board under review; where the evidence could reasonably support conflicting conclusions, it is up to the board, not the Court, to resolve the conflict. Doherty v. Retirement Board of Medford, 425 Mass. at 135, 141-42.
The Framingham Wetlands Protection By-Law, Article V of the Town By-Laws, sets forth the Town’s overall policy in its preamble as follows: “There shall be no net loss of wetlands or wetlands resource areas." Paragraph 18.2 defines the Conservation Commission’s jurisdiction to regulate in furtherance of that policy:
Except as permitted by the Conservation Commission or as provided by this by-law, no person shall remove, fill, dredge, build upon, degrade, discharge *539 into or otherwise alter the following resource areas: . . . vernal pool . . . Said resource areas shall be protected whether or not they border surface waters. The Commission may establish a no-work/no alteration zone as appropriate to each application.
Under paragraph 18.2, the Commission’s authority to regulate the plaintiff s project depended on whether the project would “remove, fill, dredge, build upon, degrade, discharge into, or otherwise alter” the vernal pool. That determination requires an understanding of the meaning of the term “vernal pool” as it appears in paragraph 18.2. Unfortunately, the by-law does not provide a definition of that term, nor have the parties directed the Court’s attention to any definition appearing in the Wetlands Protection Act, or in regulations thereunder. The by-law does, however, provide in paragraph 18.9 a definition of the term “vernal pool habitat,” as follows:
Vernal Pool Habitat means confined basin depressions which, at least in most years, hold water for a minimum of two continuous months, and which are free of adult fish populations, as well as the area within 125 feet of the mean annual boundaries of such depressions. These areas are essential breeding habitat, and provide other extremely important wildlife habitat functions during non-breeding season as well, for a variety of amphibian species such as wood frog (Rana sylvatica) and the spotted salamander (Ambystoma macultum), and are important habitat for other wildlife species.
This definition, read according to its plain terms, describes a “habitat” that includes a wetland area — the “vernal pool” — and a surrounding 125-foot buffer zone area. This interpretation is consistent with the by-law’s definition of “Buffer Zone,” also appearing in section 18.9, as “that area of land extending one hundred-twenty-five (125) feet horizontally outward from the boundary of any resource area specified in this Bylaw (Para 18.2). ” The “resource area” listed in paragraph 18.2 is “vernal pool,” not “vernal pool habitat"; it follows that the 125-foot surrounding area described in the definition of “vernal pool habitat” is not part of the vernal pool itself, but is its buffer zone. Thus, the issue properly before the Commission was whether the plaintiffs proposal would “remove, fill, dredge, build upon, degrade, discharge into, or otherwise alter” not merely the buffer zone, but the vernal pool itself.
The plaintiff did not propose to remove, fill, dredge, build upon, degrade, or discharge into the vernal pool, nor did the Commission or any member of the public who appeared at the hearing suggest that he did. The issue thus came down to whether his proposed construction would “alter” the vernal pool. The by-law defines “alter” as “to change the condition of any Area Subject to Protection Under the Act.” Examples provided include “changing of pre-existing drainage characteristics, flushing characteristics, salinity distribution, sedimentation patterns, flow patterns, and flood retention areas”; “lowering of water level or water table”; “destruction of vegetation”; and "changing of water temperature, biochemical oxygen demand (BOD), and other physical, biological or chemical characteristics of the receiving water." The Commission’s jurisdiction thus depended on whether the plaintiffs planned construction would change the condition of the vernal pool, with respect to characteristics such as those listed in these examples.
The plaintiff, as he acknowledges, had the burden of providing the Commission with information sufficient for it to make that determination. Under paragraph 18.4 of the by-law, he was required to “include such information and plans as required by the regulations and as are deemed necessary by the Conservation Commission to describe the proposed activities and their effects on the environment.”[6] Under paragraph 18.7, the Com'mission “is empowered to deny a permit for failure to submit necessary information and plans requested by the Conservation Commission,” as well as on substantive grounds of “failure to meet the requirements of this bylaw” or "failure to avoid or prevent unacceptable significant or cumulative effects upon the wetland values protected by this bylaw,” and “where no conditions are adequate to protect those values.”
In denying the plaintiffs application, the Commission did not decide the issue on which its jurisdiction depended: whether the project would alter the vernal pool. Rather, in its written decision and in its vote as reflected in the transcript of its proceedings, the Commission relied on two quite distinct grounds, neither of which addresses that issue. The Commission voted to reject the project on a motion based on “its impact on the forested upland area,” as well as the “hemmed in” nature of the lot, although the Commission’s written decision relied on the plaintiffs purported failure to “supply requested information.”
The decision clearly cannot stand on either of these grounds. As the discussion supra demonstrates, forested upland area is not a “resource area” protected under paragraph 18.2 of the by-law. Accordingly, the Commission is not empowered to protect forested upland area by prohibiting construction on such an area, even where such an area falls within a buffer zone. Rather, the Commission’s authority is limited to those projects that it finds will alter a resource area. It may be, in a particular case, that construction on a forested upland area within a buffer zone will alter a resource area, but the Commission did not so find in this case. Without such a finding, “impact on the forested upland area” cannot suffice as a ground for denial. The ground given in the written decision is equally inadequate because it is simply inconsistent with the record of the proceedings as transcribed. The transcript reflects that the Commission, as a body, never requested the plaintiff to provide a Wildlife Habitat Study, or any other information beyond what he did provide. One commissioner did ask the plaintiff “(h]ow do you feel about conducting a study and *540 bearing that,” to which he received a non-committal response. Such an inquiry, by a single commissioner, without a vote of the commission, can hardly suffice as a determination by the Commission of the necessity of such a study.[7] The decision thus lacks support in the record, and must be vacated.
The question arises whether the matter should be remanded to the Commission for it to determine the jurisdictional issue of whether the project will alter the vernal pool, and if so, to decide in its discretion whether to issue the requested permit. Remand would be required if the record would support a finding of jurisdiction; the role of finding facts from conflicting evidence, and exercising discretion based on facts found, belongs to the Commission, not the Court. If however, the record is such that no reasonable fact finder could find jurisdiction, a remand would serve only to prolong an already drawn out process, further delaying the plaintiff from exercising his right to utilize his property.[8]
Having carefully reviewed the record of the proceedings before the Commission, the Court concludes that it compels a determination of no jurisdiction. The only evidence presented on the dispositive issue was that offered by the plaintiff, through the report of his engineering expert, to the effect that the project would not alter the vernal pool. As the commissioners noted, the expert was an engineer, not a wildlife specialist. The Commission was not compelled to credit his opinions on wildlife matters, although no basis appears for rejecting his views on matters clearly within his area of expertise, particularly the physical characteristics of the site, including its slope and the level of moisture in its upland areas.
But the Commission’s rejection of the plaintiffs expert is not in itself evidence, and the record is simply devoid of any contrary evidence as to any effect of the project on the vernal pool. The commissioners’ generalized concern that the loss of open space in forested upland areas would deprive the wood frog of needed habitat does not fill the gap, without evidence that this particular project would have any effect on the vernal pool in issue. The commissioners’ belief, based on their general knowledge and internet research, that wood frogs migrate distances greater than the buffer zone, does not indicate that this particular construction within the buffer zone will affect the vernal pool.[9] Nor does the Town’s apparently negative experience with a vernal pool at the Shopper’s World development bear on the issue, in the absence of any evidence as to the cause of the loss of that vernal pool, such as might shed light on potential impact of this project on the vernal pool in issue here.
The Court has not ignored the deference due to the specialized expertise of the Commission. See Cobble v. Commissioner of the Department of Social Services, 430 Mass. 385, 394-95 (1999). But the Commission may not substitute its expertise for evidence. See id., citing Daniels v. Board of Registration in Medicine, 418 Mass. 380, 389 (1994). Since the record before the Commission provided no basis for its exercise of jurisdiction to deny the application, the plaintiff was entitled to the requested order of conditions. As the DEP has already issued a superseding order of conditions under state law, which may serve as the order of conditions under the Town by-law, no further action by the Commission is necessary.
CONCLUSION
For the reasons stated, it is hereby ORDERED that JUDGMENT enter as follows. On Count I, seeking review pursuant to G.L.c. 249, §4, the decision of the Commission is VACATED, and it is ordered that the superseding order of conditions issued by the Department of Environmental Protection pursuant to the Wetlands Protection Act shall serve as the order of conditions pursuant to the Framingham Wetlands By-Law. Count II, seeking declaratory judgment, is DISMISSED.

 One of the abutters who spoke at the hearings in opposition to the application was a member of the Commission who recused himself from participating in the decision.

 The written report appears on letterhead of Northborough Engineering, Inc. The record does not explain the relationship between that firm and Cornerstone Engineering.

 One of the abutters cited his own observation of a wood frog in the area of his driveway.

 The complaint includes a second count seeking declaratory judgment, as well as the first count seeking review under G.L.c. 249, §4. For the reasons explained in Bermant v. Board of Selectmen of Belchertown, 425 Mass. 400, 404 (1997), declaratory judgment is not available here, and accordingly Count II must be dismissed.

 The docket does not explain the lack of action in the case for some two years, or the parties’ failure to comply with the time requirements of Superior Court Standing Order 1-96.

 The parties have not called to the Court’s attention any regulations issued by the Commission pursuant to its authority under the by-law.

 There is considerable room for doubt as to whether the Commission could properly have placed on the plaintiff the burden of undertaking, and funding, a study of the sort described. Paragraph 18.4 of the by-law refers to “information and plans ... to describe the proposed activities and their effects On the environment.” That phrase hardly seems broad enough to encompass a general study, as described by the commissioner who made the suggestion, to determine “what is an appropriate distance in general for the protection of vernal pools.” DEP regulations provide for an applicant to submit a Wildlife Habitat Evaluation, meeting specified criteria, but only “[t]o the extent that a proposed project on inland Banks, Land Under Water, Riverfront Area, or Land Subject to Flooding will alter vernal pool habitat or will alter other wildlife habitat beyond the thresholds permitted under" specified regulatory provisions. 310 Code Mass. Regs. §10.60(l)(a). Nothing in this record suggests that the plaintiffs proposal would involve construction on any inland bank, land under water, or land subject to flooding.

 As noted supra, it is unclear to what extent the plaintiff himself has contributed to the last two years of the delay by failing to move promptly for judgment in this action.

 The significance of an abutter having seen a wood frog in the area of his driveway is not apparent. If anything, it may tend to show that wood frogs are able to utilize developed areas, at least with the relatively low level of density present in the area in issue.