PAUL J. DURKIN vs. BOSTON RETIREMENT BOARD.

No. 12-P-741.

Bristol. December 4, 2012. - January 18, 2013.

Present: KANTROWITZ, KATZMANN, & HANLON, JJ.

*Police,* Retirement. *Pension. Public Employment,* Forfeiture of pension, Police. *Municipal Corporations,* Pensions, Police.

In a civil action, a District Court judge correctly required the forfeiture of a police officer's pension, pursuant to G. L. c. 32, § 15(4), where the officer's off-duty shooting of a fellow officer was directly related to his position, in that it demonstrated a violation of the public's trust as well as a repudiation of his official duties. [118-119]

CIVIL ACTION commenced in the Taunton Division of the District Court Department on October 13, 2011.

The case was heard by *Francis J. Marini,* J.

After the filing of an action in the nature of certiorari in the Supreme Judicial Court for the county of Suffolk, the case was transferred to the Appeals Court.

*Joseph G. Sandulli* for the plaintiff.

*Timothy J. Smyth* for the defendant.

KANTROWITZ, J. In this pension forfeiture matter, we hold that the criminal actions of Paul J. Durkin were directly linked to his position as a police officer. As such, we affirm the decision of a judge of the District Court that determined that the Boston retirement board (board) correctly decided that Durkin's pension was forfeited.

*Facts.* Durkin was a Boston police officer. On June 21, 2006, after finishing his afternoon shift, he went to an evening cookout at the Dorchester Yacht Club. He attended the cookout in civilian clothes and carried his department-issued firearm in his off-duty holster on his hip, as was permitted. Sometime after midnight, after consuming alcohol at the cookout, Durkin left

and drove to a lounge in the Dorchester section of Boston, where he continued to drink.

As Durkin was leaving the lounge, a fellow police officer, Joseph Behnke, believing Durkin too intoxicated to drive, suggested that Durkin sleep at Behnke's house in the West Roxbury section of Boston. Durkin agreed. Upon their arrival at Behnke's house, Durkin, who had fallen asleep during the drive, woke up, left the car, and started walking "in a highly intoxicated state" in a direction away from Behnke's house. Behnke followed Durkin on foot, asking him to come back to the house. In response, Durkin, from a distance of five to six feet, pulled out his weapon and fired one shot at Behnke, striking him near his hip. In response, Behnke shouted, "I've been shot, Paul, you shot me!" Durkin walked away and, while leaving the scene, called a friend on his cellular telephone and asked to be picked up and driven away.

On April 23, 2007, Durkin pleaded guilty to assault and battery by means of a dangerous weapon.[1] On March 31, 2009, he applied to the board for deferred superannuation retirement. Upon receiving no response, he requested a hearing. At the subsequent July 15, 2011, board hearing, Durkin acknowledged, among other things, that "the most important duty of a police officer is to protect life." On September 22, 2011, the board voted, pursuant to G. L. c. 32, § 15(4), to deprive Durkin of his pension.

Durkin appealed to the District Court, and the judge affirmed the decision of the board, finding that "laws prohibit[ing] . . . assault and battery by means of [a] dangerous weapon [were] certainly applicable to police officers who routinely carry such weapons on and off duty, who are trained extensively in their use and who have specific rules and regulations regulating their use."[2]

---

[1]Durkin was sentenced to three years of probation, a sentence with which Behnke agreed.

[2]Durkin appealed to the Supreme Judicial Court, which remanded the matter to this court. Whether Durkin should have first proceeded to the Superior Court as in *Doherty* v. *Retirement Bd. of Medford*, 425 Mass. 130, 131 (1997), and *Scully* v. *Retirement Bd. of Beverly*, 80 Mass. App. Ct. 538, 538-539 (2011), rather than the Supreme Judicial Court (as is permitted under an action for certiorari), is a procedural issue neither raised by the parties nor addressed further by us.

*Discussion.* The applicable standards are set out in *Retirement Bd. of Maynard* v. *Tyler, ante* 109, 111-112 (2013), and need not be reiterated here. Nor do we need to dwell at length on the special position that police officers hold. As the Supreme Judicial Court wrote in *Attorney Gen.* v. *McHatton*, 428 Mass. 790, 793-794 (1999), quoting from *Police Commr. of Boston* v. *Civil Service Commn.*, 22 Mass. App. Ct. 364, 371 (1986):

> "Police officers must comport themselves in accordance with the laws that they are sworn to enforce *and* behave in a manner that brings honor and respect for rather than public distrust of law enforcement personnel. They are required to do more than refrain from indictable conduct. Police officers are not drafted into public service; rather, they compete for their positions. In accepting employment by the public, they implicitly agree that they will not engage in conduct which calls into question their ability and fitness to perform their official responsibilities." (Emphasis in original.)

See *Falmouth* v. *Civil Serv. Commn.*, 61 Mass. App. Ct. 796, 801-802 (2004) ("[p]olice officers must . . . behave in a manner that brings honor and respect for rather than public distrust of law enforcement personnel. This applies to off-duty as well as on-duty officers" [citations omitted]).[3]

In *State Bd. of Retirement* v. *Bulger*, 446 Mass. 169, 179 (2006), the Supreme Judicial Court, in upholding the forfeiture of the member's pension, discussed off-duty conduct:

> "At the heart of a clerk-magistrate's role is the unwavering obligation to tell the truth, to ensure that others do the same through the giving of oaths to complainants, and to promote the administration of justice. When [the member] committed the crimes of perjury and obstruction of justice, he violated the fundamental tenets of the code and of his oath of office, notwithstanding his contention that such misconduct occurred in the context of what was arguably a personal matter."

It cannot be gainsaid that police officers, who are extensively

---

[3]We recognize the different standards between job termination or disqualification and pension forfeiture.

trained in the use of firearms, and who carry their service revolvers with them while off-duty, have a high degree of responsibility[4] to which the public deserves and demands adherence. Simply, an officer who consumes an excess amount of alcohol and uses his service revolver to shoot, without any justification whatsoever, a fellow officer from a distance of a few feet has sadly breached that trust.

The nexus required by G. L. c. 32, § 15(4), is not that the crime was committed while the member was working, or in a place of work, but only that the criminal behavior be connected with the member's position. "The nature of [the member's] particular crimes cannot be separated from the nature of his particular office when what is at stake is the integrity of [the] system." *Id.* at 180. Here, Durkin engaged in the very type of criminal behavior he was required by law to prevent. This violation was directly related to his position as a police officer as it demonstrated a violation of the public's trust as well as a repudiation of his official duties. Clearly, at the heart of a police officer's role is the unwavering obligation to protect life, which Durkin himself recognized at his hearing. His extreme actions violated the integrity of the system that he was sworn to uphold. The board and the District Court judge acted properly in concluding that Durkin's pension is forfeited.[5]

*Judgment affirmed.*

---

[4]See Boston Police Department Rules and Procedures on Use of Deadly Force, Rule 303, § 5 (Pointing Firearms) and § 6 (Discharge of Firearms) (April 11, 2003).

[5]In *Retirement Bd. of Maynard* v. *Tyler, supra* at 112-113, a pension was ordered reinstated as, however reprehensible the actions of the member (a firefighter), they were not directly linked to his official duties. Notwithstanding the high standards placed on firefighters and police officers, not every off-duty illegal act qualifies as a "violation of the laws applicable to his office or position." *Bulger*, 446 Mass. at 179, quoting from G. L. c. 32, § 15(4). As both *Tyler* and this matter demonstrate, every case must be decided by examining its own set of unique facts and circumstances. *Bulger, supra* at 175.