Fabricant, J.
INTRODUCTION
This is an action for judicial review, pursuant to G.L.c. 30A, §14(7), of a decision of the Alcoholic Beverages Control Commission (ABCC), requiring the plaintiff Brown-Forman Corporation (Brown-Forman) to make regular sales of certain alcoholic beverage products to intervenor M.S. Walker, Inc. (Walker), pursuant to G.L.c. 138, §25E. Before the Court are cross motions for judgment on the pleadings of BrownForman and Walker.[1] For the reasons that will be explained, the decision of the ABCC will be reversed.
BACKGROUND
The record of the administrative proceeding before the ABCC provides the following background. The proceeding arose from an application filed with the ABCC on October 11, 2001 by Walker seeking an order requiring Brown-Forman to continue making sales to Walker of certain brand items of rum produced by J. Wray & Nephew Limited (Wray). Walker filed its application upon receiving notice that Brown-Forman, having assumed the role of distributor of the Wray brands, would refuse to sell them to Walker. The ABCC held a hearing on the application on June 20, 2002[2] and issued its decision on March 25, 2003. The ABCC found and ruled as follows.
Wray produces and sells several types of rum. Beginning in October 1987, Carriage House Import Ltd. was the exclusive United States supplier of the Wray brands. Carriage House was owned by Rums International, Inc., which was owned by Richard Costa. Richard Costa’s father owned Wray. Effective January 1, 1993, Wray entered into an exclusive distribution agreement with Carriage House for a four-year period. Under the agreement, Carriage House was required to buy specified minimum quantities of the products, and to spend specified minimum amounts *722 for marketing and advertising Wray brand items. Wray was required to make specified cash contributions to Carriage House, based on the amounts purchased. Wray had the right to visit Carriage House’s distributors. The agreement designated Carriage House as Wray’s agent for purposes of compliance with alcoholic beverage laws of the states within the United States. In addition, Rums International, Inc. licensed to Carriage House exclusive use of the trademarks of the Wray brands. Under the trademark license, Rums International, Inc., had control over Carriage House’s use of the trademarks, as well as the right to receive a royalty based on the number of cases Carriage House purchased from Wray.[3] Based on these provisions, the ABCC concluded that Wray had control of Carriage House’s marketing and sales activities of Wray’s products. On that basis, it concluded that Carriage House was Wray’s agent, and it imputed the sales made by Carriage House to Wray.
In October 1994, a corporate affiliate of Wray acquired all the stock of Carriage House, and Carriage House became a wholly owned subsidiary of that entity. The ABCC cited that relationship as a further basis for imputing Carriage House’s sales to Wray. Carriage House made regular sales to Walker between 1987 and 1997.
In January 1997, Wray entered into an exclusive distributorship agreement with an entity then known as Heublein, Inc., now known as UDV. The agreement included a number of terms that the ABCC characterized as “similar, if not identical, to” provisions that had appeared in the 1993 agreement between Wray and Carriage House and that, in the ABCC’s view, “continued to give Wray control of UDVs marketing and sales activities with the Brand Items.” Among these were that Wray continued to own all trademarks and associated goodwill; Wray continued to produce and bottle the products, and UDV did not bottle any product; UDV obligated itself to sell minimum quantities, failing which Wray had the right to terminate; the sales price was fixed as FOB Jamaica; the agreement required UDV to make specified minimum expenditures for advertising, marketing, and promoting the brands; and Wray was required to make specified financial contributions for advertising, marketing and promotion ventures undertaken by UDV. Based on these provisions, the ABCC concluded that “Wray held such sufficient control of UDVs marketing and sales activities with the Brand Items that UDV was the agent of Wray for the marketing and sale of the Brand Items.”
Additional provisions of the agreement between Wray and UDV contributed to the ABCC’s perception of an agency relationship. These included provisions for semi-annual approval by Wray of UDVs plan for advertising, marketing, and promoting the brands; a power in Wray to veto any activity by UDV “inconsistent” with the approved plan or that Wray determined was “reasonably likely to materially damage” Wray’s reputation; power in Wray to influence UDV’s allocation among its sales force of competing products; and a requirement that UDV employ one managerial employee “devoted substantially full-time” to Wray’s brands. On the basis of its finding of agency, the ABCC imputed UDVs sales to Wray.[4]
In the fall of 2001, the Federal Trade Commission expressed antitrust concerns in connection with a proposed acquisition by UDVs parent corporation. To allay those concerns, Wray and UDV terminated their agreement effective October 1, 2001. Wray then entered into an exclusive import agreement with Brown-Forman, effective that same date. Wray’s agreement with Brown-Forman, similar to its prior agreement with UDV, contains provisions that, in the ABCC’s view, “give[ ] Wray control of the marketing and sales activities with the Brand Items.” Such provisions include that Wray continues to own all trademarks, intellectual property, and associated goodwill; Wray continues to produce and bottle the products, and Brown-Forman does not bottle any product; Brown-Forman is required to sell minimum quantities, failing which it would lose the right to extend the agreement; the sales price is fixed as FOB Jamaica; the agreement establishes minimum expenditures by Brown-Forman for advertising, marketing, and promoting the brands; and Wray is required to contribute fifty percent of the expenses incurred by Brown-Forman for marketing, advertising, and promoting the brand items. Based on these provisions, the ABCC concluded that “Wray is again given sufficient control of marketing and sales activities with the Brand Items that [Brown-Forman] is the agent of Wray for the marketing and sale of the Brand Items.”
The ABCC identified additional contract provisions as bolstering its conclusion. These included provisions for approval by Wray of Brown-Forman’s plan for advertising, marketing, and promoting the brands; payment by Wray of fifty percent of expenses of administering the approved marketing plan; a specified budget for those activities, set as a percentage of Brown-Forman’s gross profits; a power in Wray to spend more by its unilateral choice; fluctuation of the budget for administering the marketing plan in proportion to the purchase price of the brand items; an agreed formula tying the purchase price of the brands charged by Brown-Forman to the price charged it by Wray; direct shipment by Wray to BrownForman’s customers, at the same price as sales by Brown-Forman; prior approval by Wray of BrownForman’s use of trademarks and intellectual property; and indemnification for claims arising out of discontinuance of a wholesaler. Based on these additional provisions, the ABCC found “that a relationship of principal and agent continues between the manufacturer of the Brand Items, Wray, and the United States distributor,” Brown-Forman. On that basis, the ABCC concluded that sales previously imputed to Wray “trigger the obligation of Respondent, Wray’s agent, to sell *723 pursuant to §25E,” and that Brown-Forman’s refusal to sell to Walker violated that provision. On March 25, 2003, the ABCC issued its order requiring Brown-For-man to continue to make sales of the Wray brands in the ordinary course of business to Walker. Brown-For-man filed this action for judicial review on April 9, 2003.
The record provides additional facts that appear beyond dispute in the stipulated exhibits. Among these is that prior to the ABCC’s order, Brown-Forman had made no sales of the Wray products to Walker. As far as the record discloses, Brown-Forman had no relationship of any kind with UDV, its predecessor as Wray’s distributor. They had no common owners, management or employees, nor did any transaction occur between them relating to the distribution of Wray products. UDV, similarly, had no relationship of any kind with its predecessor, Carriage House; they had no common owners, managers, or employees, and did not enter into any transaction between themselves. UDV did not hire any former Carraige House employee. In addition, as far as the record discloses, neither UDV nor Brown-Forman had any relationship with Wray or its affiliates prior to each distribution agreement, nor has either at any time had any relationship with Wray other than that established by the distribution agreements. No common ownership, management, assets, or employees existed between Wray and either UDV or Brown-Forman.
DISCUSSION
Under G.L.c. 30A, §14(7), a reviewing court may reverse, remand, or modify an agency decision if “the substantial rights of any party may have been prejudiced” because the agency decision is based on an error of law or on unlawful procedure, is arbitrary and capricious, or is unwarranted by facts found by the agency supported by substantial evidence. The party seeking review bears the burden of demonstrating the invalidity of the agency’s decision. Merisme v. Board of Appeal on Motor Vehicle Liab. Policies and Bonds, 27 Mass.App.Ct. 470, 474 (1989).
Substantial evidence is “such evidence as a reasonable mind might accept as adequate to support a conclusion.” G.L.c. 30A, §1(6). In considering whether substantial evidence supports the facts found, the Court must examine the entire record and take into account whatever fairly detracts from the weight of the conclusion reached. See Doherty v. Retirement Board of Medford, 425 Mass. 130, 135 (1997); Pyfrom v. Commissioner of the Department of Public Welfare, 39 Mass.App.Ct. 621, 624 (1996). The Court is required to “give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it” by statute. G.L.c. 30A, §14(7) (1997). See Flint v. Commissioner of Pub. Welfare, 412 Mass. 416, 420 (1992); Seagram Distillers Co. v. Alcoholic Beverages Control Comm’n, 401 Mass. 713, 721 (1988).
The reviewing court may not substitute its judgment for that of the agency. See Southern Worcester County Regional Vocational Sch. v. Labor Relations Comm’n, 386 Mass. 414, 420-21 (1982), citing Olde Towne Liquor Store, Inc. v. Alcoholic Beverages Control Comm’n, 372 Mass. 152, 154 (1977). Nor may a court reject an administrative agency’s choice between two conflicting views, even though the court justifiably would have made a different choice had the matter been presented de novo. Zoning Bd. of Appeals v. Housing Appeals Comm’n, 385 Mass. 651, 657 (1982) (citations omitted). As to issues of law, however, the Court conducts de nouo review, deferring to the agency only with respect to its consistent interpretation of a statute it is empowered to administer. See, Heublein v. Capital Distributing Company, Inc., 434 Mass. 698, 705-07 (2001).
General Laws chapter 138, section 25E, makes it unlawful
... for any manufacturer, winegrower, farmer-brewer, importer or wholesaler to refuse to sell, except for good cause shown, any item having a brand name to any licensed wholesaler to whom such manufacturer, winegrower, farmer-brewer, importer or wholesaler has made regular sales of such brand item during a period for six months preceding any refusal to sell.
The record establishes that Brown-Forman did not make sales of Wray brands to Walker (or anyone else) during the six-month period prior to its refusal to sell. Accordingly, §25E has no application unless the sales made by UDV to Walker are imputed to Brown-For-man. See Pastene Wine & Spirits Co. v. Alcoholic Beverages Control Commission, 401 Mass. 612, 618 (1988). Such imputation does not arise merely from Brown-Forman’s status as UDVs successor in the role of distributor of Wray brands; §25E obligations “do not automatically travel with the product.” Heublein v. Capital Distributing Company, Inc., 434 Mass, at 701; Pastene, supra, at 619.
Reported decisions have approved imputation of prior sales for purposes of §25E under limited circumstances. The circumstances previously recognized in the cases are: (1) where a transfer has occurred for the purpose of circumventing §25E, see Heublein, 434 Mass, at 704, Pastene, 401 Mass, at 616; (2) where the previous supplier has assigned distribution rights to the new supplier, see Heublien, Inc. v. Alcoholic Beverages Control Comm’n, 30 Mass.App.Ct. 611, 614-16 (1991); and (3) where the new supplier is an agent of the previous supplier, see Heublein v. Capital Distributing Company, Inc., 434 Mass, at 706.[5] In this case, the ABCC did not find any effort to circumvent §25E, nor did it find any assignment, agency, or other relationship between UDV and Brown-Forman. The theory on which the ABCC relied *724 goes a step further; here the ABCC imputed sales by one supplier to its successor based on a finding of agency relationships between each supplier and the manufacturer.
The ABCC’s theory, although apparently without precedent in reported decisions, has logical support. If the conduct of an agent is imputed to the principal, so that obligations arising from that conduct fall to the principal, it follows that the principal must exercise its control over a subsequent agent to ensure compliance with those obligations. Application of the theory necessarily depends, however, on correct identification of the claimed agency relationships.
The subsidiary facts underlying the ABCC’s finding of agency relationships consist of the terms of the distributorship agreements. Those terms are undisputed, and appear in the agreements themselves, which are part of tiie record. The ABCC’s finding of agency relationships based on those terms is not so much a factual determination, subject to review on a substantial evidence standard, as it is a matter of application of legal principles to undisputed facts, subj ect to de novo review. The legal principles in issuethose governing the common-law doctrine of agencyare not of the sort that would fall within the technical expertise of the ABCC. See Griffin’s Brant Rock Package Store, Inc. v. Alcoholic Beverages Control Commission, 12 Mass.App.Ct. 768, 771 (1981). The Court therefore reviews the ABCC’s finding of agency as a matter of law, without any particular deference to the ABCC.[6]
The test of an agency relationship is whether the principal has “the right to control” the purported agent. One who has the power to control another is the principal, and the one under that power is an agent, whether the power to control is exercised or not. But “(i]f the power of control rests with the person employed, he is an independent contractor.” Cowan v. Eastern Racing Association, Inc., 330 Mass. 135, 141 (1947). The question of control must be considered with respect to the particular conduct in issue, since “a person may be an agent or a servant as to one part of an undertaking, and an independent contractor as to other parts.” Id. at 141-42.
Of the provisions the ABCC cited as indicating an agency relationship between Wray and UDV, several lack any apparent relationship to the issue of control of the distribution of the product. These include Wray’s continued ownership of trademarks and associated goodwill; its continued exclusive role in manufacturing and bottling the product; its right of termination if sales did not meet minimum quantities; the setting of the sales price FOB Jamaica; and Wray’s contributions to expenditures for advertising, marketing, and promotion. The cited provisions that appear at least potentially to bear on the question of control are those relating to methods of advertising, marketing, and promoting the brands. These appear in paragraphs 5 and 6 of the agreement.
Paragraph 5 of the agreement is entitled “Marketing.” Subparagraph (a) sets out a method for development of semi-annual plans for advertising, marketing and promotion of the products; the parties agreed to meet twice each year “to discuss plans,” to include “the intended personality and positioning of each Product, the pricing strategy and projected allocation” of expenditures. The agreement provides that, “(t]he Distributor, however, shall be solely responsible for implementing such activities and plans in the Territoiy.” Wray, under the agreement, may “have the Distributor discontinue any advertising, merchandising or promotion that are inconsistent with the approved plan or are subject to verifiable governmental or general public criticism that is reasonably likely to materially damage [Wray’s] reputation in any market it does business.” If the parties fail to agree on a plan, the previous year’s plan continues in effect.
Subparagraph (b) of paragraph 5 addresses UDV’s distribution of competing products. The parties agree that, in UDV’s largest markets, with certain exceptions, Wray may request that its products be separated from competing products by being assigned to separate sales groups.[7] Subparagraph (c) addresses expenditures for marketing, advertising, merchandising, and promotion. The parties agreed that UDV would expend certain minimum amounts, set in absolute numbers for the first and second years, and as a percentage of net sales for subsequent years;[8] they also agreed that Wray would expend a specified minimum amount each year, plus an additional amount in later years if UDV met certain sales objectives. Paragraph 6(e), finally, requires UDV to “appoint one marketing manager whose business responsibility shall be devoted substantially full-time to the Products.”[9]
Certain additional provisions, not discussed by the ABCC, bear on the issue of control. Paragraph 2(e) provides that UDV “shall have the right to appoint such sub-distributors, brokers and agents in the Territory as it deems advisable in order to perform its rights and obligations under this Agreement.” Under paragraph 4(d), Wray must allow UDV or any of its “representatives or agents” to review and copy Wray’s records so as to verify pricing information. Under paragraph 4(e), all carriers engaged to ship the product “shall be the agents of” UDV, and UDV “shall have the right to determine the point of destination in the Territory or direct such shipment to a specific customer . . . and the method of shipment of, and the carriers for, the Products.” Paragraph 17 recites that “The parties acknowledge that no joint venture has been created by this Agreement and that neither party can take any action that is legally binding on the other party without the prior consent of the party to be charged.”
The Court is not persuaded that the provisions cited by the ABCC, considered in the overall context of the agreement, empowered Wray to control UDV sufficiently to establish an agency relationship. That par *725 ties engaged in a mutually beneficial endeavor agreed to a joint planning process for certain aspects of the endeavor does not, in itself, put one in control of the other. They had distinct roles, and distinct interests, but the common objective of selling as much of the product as possible; each could fairly view it as in its own interest to coordinate in that effort, without ceding control of its own sphere. Wray had the overriding objective of maximizing its sales in all markets; that it would negotiate a power to veto conduct inconsistent with its efforts to achieve that objective is hardly surprising, and does not in itself establish overall control. The specification of minimum expenditures on both sides does not indicate control of one by the other; neither is granted any unilateral right to dictate the other’s spending obligation, or to avoid its own. Most important for purposes of §25E, the agreement gave Wray no power whatever to dictate the identity of the wholesalers to whom UDV would sell the product within its territory; to the contrary, the agreement assigned sole responsibility for that function, as well as for other aspects of implementation, to UDV. The Court therefore concludes that the ABCC’s finding of an agency relationship between Wray and UDV was erroneous as a matter of law.
The absence of an agency relationship between Wray and UDV in itself negates the foundation for the ABCC’s imputation of UDVs sales to Brown-Forman. The Court nevertheless has examined the agreement between Wray and Brown-Forman, and concludes that the ABCC’s characterization of that relationship is similarly unsupported. Here again, the ABCC decision relies in part on a series of provisions that have no apparent bearing on control, including Wray’s continued ownership of trademarks, intellectual property, and associated goodwill; its continued manufacturing and bottling of the products; its right of termination if sales did not meet minimum quantities; the setting of the sales price FOB Jamaica; Wray’s contributions to expenditures for advertising, marketing, and promotion; indemnification; adjustment of prices from Wray to Brown-Forman in relation' to the prices Brown-Forman charges its customers; and direct shipment from Wray to Brown-Forman’s customers.[10] The provisions cited by the ABCC that do appear potentially related to the issue of control are those in Article 3, relating to advertising and sales promotion, and Article 8.01, regarding use of trademarks and intellectual property.
Article 3.02 sets out a method for collaboration between the parties on a marketing plan for each contract year after the first, for which a plan had already been agreed to; Brown-Forman is to prepare a plan each year, including “key functional strategies, including product positioning, development strategy, advertising campaigns and strategies . . . Brand Expense budget, and merchandising and promotional strategy.” Wray may then comment on the plan; the two then consult “as necessary to arrive at a final Marketing Plan which will be subject to written approval” by Wray. If the two cannot agree, the prior year’s plan remains in effect. After approval, pursuant to Article 3.02(4), Brown-Forman “will implement, or use diligent efforts to cause its distributors to implement, the advertising campaigns and use diligent efforts to implement the balance of such final Marketing Plan.”
Article 3.03 governs marketing expenses. The agreement sets out a specified budget for marketing, in a fixed amount for the first year and as a percentage of Brown-Forman’s gross profits in subsequent years, subject to change by agreement. Each side is responsible for half of the agreed budget. Pursuant to Article 3.03(d), either side may “unilaterally” increase expenditures, without any required contribution from the other side to the excess amount.
Article 8 addresses trademarks and intellectual property rights. Wray retains ownership, granting to Brown-Forman the right to use such properly “in any and all advertisements, point of sale materials, promotional goods and all other promotional and related materials and practices customarily used in connection with the sale of beverage alcohol products in the Territory . . . provided that such use has been approved by [Wray] in writing either in the approved marketing plan or otherwise ...”
Certain additional provisions, again not discussed by the ABCC, bear on the issue of control. Under Article 4.01, Brown-Forman “will engage an adequate number of distributors, wholesalers or agents, with properly trained sales forces and the ability to promote the sale of the Product in the Territory.” Article 11.01 provides that the parties “each will be deemed by this Agreement to be an independent contractor. Neither will in any way be deemed to be the agent of or partner with the other and neither will have any authority by this agreement to assume any obligations of any kind express or implied on behalf of the other or to bind the other in any way.”[11] Article 11.02 provides that Brown-Forman “will not be considered at any time a sales representative, commission agent or broker” and “will not be entitled to a sales commission.”
The provisions recited, as the ABCC observed, bear considerable resemblance to corresponding provisions of Wray’s agreement with UDV. For the same reasons discussed supra with respect to the UDV agreement, the Court is not persuaded that these provisions establish an agency relationship. The parties agreed to collaborate in the area of their joint endeavor that affects their common interests, but nevertheless maintained distinct roles, as to which each has separate responsibility. They agreed to specified expenditures, but neither has the power to dictate the amount of the other’s expenditures. Most important, the agreement gives Wray no role in the selection of wholesalers; Brown-Forman performs that function entirely independently. The Court therefore concludes *726 that the ABCC’s finding of an agency relationship between Wray and Brown-Forman was erroneous as a matter of law.
CONCLUSION AND ORDER
For the reasons stated, the Plaintiffs Motion for Judgment on the Pleadings is ALLOWED; the Intervenor’s Cross Motion for Judgment on the Pleadings is DENIED; and it is hereby ordered that JUDGMENT enter reversing the decision of the Alcoholic Beverages Control Commission. *727 argued that only amounts incurred prior to notice should be barred.

The ABCC has left the defense of this case to Walker.

By stipulation of the parties, the hearing consisted of the submission of stipulated exhibits and the filing of memoranda of law. No oral testimony occurred.

The ABCC noted that the evidence did not indicate how Rums International, Inc., obtained the trademarks to Wray’s brands. The ABCC perceived “a close degree of cooperation and concerted business planning and operation” among Wray, Rums International, Inc., and Carriage House.

Although the ABCC did not expressly so find, it appears to be undisputed that UDV had sold Wray’s brands to Walker for at least six months during the period of UDVs distributorship agreement with Wray.

Previous ABCC decisions, acknowledged in Pastene, supra, at 618, n.5, but not under review there, extended the agency theory to impute to a manufacturer engaged in direct distribution sales previously made by the manufacturer’s agent.

The ABCC’s expertise could be expected to extend to norms and practices in the liquor industry, such that it would recognize contract provisions that are common in distribution agreements, and those that are not. A finding by the ABCC that a particular distribution agreement contains terms that are outside the norm in the industry, such as to give the manufacturer an unusual degree of control, would be entitled to deference from a reviewing court. The ABCC made no such finding here.

The ABCC’s decision describes this provision as follows: “Wray controlled UDVs choice and assignment of who sold competing rums.” The actual provision falls short of that description: Wray is empowered only to request separation of its products from those of competitors.

The ABCC’s decision describes this provision as follows: “Wray established substantial minimum expenditures to be made by . . . UDV.” The description suggests a unilateral determination by Wray. The actual provision does not support that suggestion.

The ABCC’s decision describes this provision as follows: “Wray controlled the assignment of one managerial employee of UDV who must be ‘devoted substantially full-time to Wray’s Brand Items.’ " The description seems to suggest that Wray had the right to determine the identity of the individual. Nothing in the agreement supports that suggestion.

The provision referred to is Article 5.05, which provides that Brown-Forman “may, from time to time, require that [Wray] ship Product to specific customers for [Brown-Forman’s] account.”

The recitation of independent contractor status is not determinative, but does reflect the parties’ view on the subject, and warrants consideration to the extent that it is consistent -with the allocation of authority under the terms of the agreement.