Sanders, Janet L., J.
Having reached an impasse in negotiating the terms of their collective bargaining agreement, plaintiff Massachusetts Bay Transportation Authority (MBTA) and defendant Local 589, Amalgamated Transit Union, AFL-CIO, CLC (Union) submitted their disputes to interest arbitration as required by G.L.c. 161A, §29. An Award issued on *83 August 26, 2013. The parties are now before the Court seeking judicial review of that Award. Significantly, the parties agree that the issues were within the arbitrator’s powers to decide. Calling the award “irresponsible” and “unjustifiably rich,” however, the MBTA argues that the Award must be vacated because it was not supported by “substantial evidence” and because the arbitrator misapplied certain statutory factors which she was required to consider. The Union has responded with a request to enforce the award or in the alternative for an injunction. After hearing and careful consideration of the party’s submissions, this Court concludes that the Union’s Motion to Confirm the Award must be Allowed.
The Court does so keeping in mind the narrow scope of judicial review that is appropriate for such matters. Certainly, courts have no power at all to review the results of collective bargaining. To the extent that interest arbitration is a substitute for such bargaining, undertaken only after the parties have reached an impasse, then my power to review the results of that process is quite limited. That is in part because the purpose of interest arbitration is to resolve a particular dispute, not to develop a body of precedent binding on future adjudications. More important, this Court has neither the expertise nor the experience necessary to resolve the complex and difficult financial and policy questions that an interest arbitrator must decide. Accordingly, this Court’s decision to enforce the Award says nothing about its wisdom or its substantive fairness. I affirm it because it complies with the law.
BACKGROUND
The events leading up to this lawsuit span several years and provide some context for the issues raised by this action. The Union and the MBTA are parties to a collective bargaining agreement (CBA) that became effective July 1, 2006 and was due to expire June 30, 2010. In the event the expiration date was reached without a new agreement, the CBA contained a standard “Rollover Clause” which provided that the terms of the CBA would remain in effect from year to year until the parties amended them. In late 2009 as the parties were preparing to negotiate the terms of a new collective bargaining agreement, the Commonwealth enacted comprehensive transportation reform. One piece of that statutory reform package had a direct impact on the collective bargaining: Section 140 of Chapter 25 of the Acts of 2009 (Section 140).
Section 140 provided in relevant part that all employees, retirees or surviving spouses and dependents of such who are currently insured or eligible to be insured by a group insurance plan offered by the MBTA shall have their eligibility and coverage transferred to the Group Insurance Commission (GIC). Enacted on an emergency basis, Section 140 stated that the transfer shall take place by January 1, 2010, unless the employee benefits were, as of that date, provided under an existing CBA. If there were such an existing agreement, the employees “shall be transferred upon the expiration date of that agreement.” The statute concluded by stating that all coverage shall be provided exclusively through the GIC and “shall not be subject to collective bargaining, and no other reimbursements or other contractual obligations shall be paid by the [MBTA] for health care benefits not provided through the [GIC].”
The Union, along with seven other unions, was of the view that this sentence of Section 140 unconstitutionally deprived them of important collective bargaining rights. In January 2011, they filed suit in Suffolk Superior Court claiming among other things a violation of the Contract Clause. See Local 589, Amalgamated Transit Union et al. v. MBTA et al., Civ. No. 13-3409 (Suffolk Superior Court). A Superior Court judge (Giles, J.), rejected that claim and allowed summary judgment for the MBTA in April 2011. The Union appealed and also utilized an administrative procedure available through the United States Department of Labor to ensure that federal funding was offered only to entities that were sufficiently protective of labor interests.[1] In June 2011, the Secretary of Labor determined that the Union’s objection was “sufficient” and encouraged the parties to find an alternative arrangement before further federal grants were certified.
With federal funding in jeopardy, the MBTA and the Union agreed to petition the Legislature to amend Section 140 so as to allow bargaining over supplementary health care benefits. In November 2011, the Legislature added language to Section 140 stating that:
Nothing in this section shall restrict the authority of the [MBTA] to bargain collectively with the authorized collective bargaining representatives of its employees over the establishment of a Health and Welfare Trust Plan [the Trust] or to pay the cost, in whole or in part, as determined by collective bargaining, of any supplementary benefits or coverages provided under such a trust plan.
St. 2011 c. 189 (the Amendment). This Amendment went on to describe generally what payments and benefits the Trust could provide without duplicating GIC benefits and coverage. It also permitted the MBTA and the Union to bargain over how to fund the Trust. In other words, although migration of MBTA employees to the GIC remained mandatory, the Union and the MBTA were now free to bargain over its consequences.
In the months following this Amendment, the MBTA and the Union bargained in good faith, attempted to resolve their differences through mediation, and reached an impasse which ultimately led them to interest arbitration. In accordance with Chapter 161A (discussed below), the parties exchanged “Last Best Offers,” and Sarah Kerr Garraty was selected by the *84 parties from a list of potential arbitrators provided by the American Arbitration Association. Hearings commenced on September 10, 2012 and concluded, after 22 days of testimony, on May 6, 2013. Each party submitted a lengthy post-hearing brief that addressed, among other things, the same issues raised by this lawsuit. On August 26, 2013, Garraiy issued a comprehensive written opinion 115 pages in length. This Court has thoroughly reviewed that opinion, since it figures prominently in my conclusions.
DISCUSSION
Not surprisingly, much of the Award did not accept either the Union’s or the MBTA’s Last Best Offer but came up with a compromise somewhere between the two. Only three of the arbitrator’s decisions are challenged by the MBTA in these proceedings. They are: 1) the wage award; 2) the rulings with respect to the Trust; and 3) the arbitrator’s rejection of the MBTA’s proposal to eliminate a rollover clause in the new agreement. The parties stipulated that the Award (if upheld) would constitute a four-year agreement covering the period from July 1, 2010 through June 30, 2014. In other words, the collective bargaining process ■will begin anew in just six months.
A. The Statutory Framework and the Scope of Judicial Review
Before this Court turns to the merits of the arguments, it is important to understand the limits on my power to second-guess an arbitrator’s decision. Those limits are informed both by case law and by statute.
Courts, both state and federal, have consistently emphasized the wide range of discretion that an arbitrator exercises and the importance of court deference to the decisions that the arbitrator renders. See e.g. Massachusetts Comm. Coll. Council v. Massachusetts Bd. of Higher Ed., 465 Mass. 791, 796 (2013) (“[0]ne of the most significant hallmarks of binding arbitration is the exceptionally limited nature of judicial review available”). In contrast to a court which functions as a public tribunal charged with administering justice for the community generally, an arbitrator is a part of a system of self-governance created by and confined to the parties themselves. United States Steelworkers v. Warrior & Gulf Navigation, 363 U.S. 574, 581-82 (1960). In the commercial context, arbitration is a substitute for litigation; in the labor context, it is a substitute for industrial strife. Id. at 579. When an arbitrator, for example, decides a grievance arising under a collective bargaining agreement, he does more than just interpret the contract; his judgment will also reflect the productivity of a particular result, its impact on the morale of the shop, and whether tensions will be heightened or diminished — considerations that a court is neither experienced nor informed enough to take into account. Id. at 582.
In contrast to the arbitration of a grievance, which decides a particular right under a labor contract, interest arbitration concerns a wide range of issues that the parties have been unable to agree to among themselves. It is to a large extent a substitute for the collective bargaining process, with the answers to be found not in the four comers of preexisting documents but rather (as one arbitral board described it) dependent on “considerations of policy, fairness, and expediency, of what the contract rights ought to be.” Twin City Rapid Transit Co., 7 LA 845, 848 (McCoy, Freeman & Goldie, 1947), quoted in Elkouri & Elkouri, How Arbitration Works, Ch. 22.3 at pp. 1358-59 (6th ed. 2003). As one commentator stated, the arbitrator is “not a superior sort of dictator, dispensing justice from on high, but an agent of the two sides to the collective bargain,” with the job of reaching a workable solution that is much more than simply an “exercise in pure reason” or a “summary of merely logical arguments.” Soule, Wage Arbitration 6-7 (1928). Even where the interest arbitration has certain criteria which must be observed by the arbitrator in deciding the issue before her, her discretion can be expected to be quite broad. Elkouri & Elkouri, How Arbitration Works, Chapter 22.3 at p. 1359.
The interest arbitration that took place in the instant case is a creature of statute, G.L.c. 161A. Its origins date back to the creation of the MBTA’s predecessor, the Massachusetts Transit Authoriiy (MTA). When the transit system became public and transit workers as public employees were given the right to bargain collectively, they were required to submit their disputes to binding interest arbitration. See Local Division 589 Amalgamated Transit Union, AFL-CIO CLC v. Commonwealth, 666 F.2d 618, 619 fh. 1 (1st Cir. 1981) (summarizing the legislation that was ultimately codified in G.L.c. 161A). In 1973, interest arbitration took place by submission of disputed issues to a tripartite panel. Five years later, concerned with rapid rising transit costs, the Legislature enacted a new statute, Chapter 405 of the Acts of 1978, which mandated a different procedure: instead of a panel, a single arbitrator “experienced in state and local finance” was to be selected. G.L.c. 161A, §30. The procedure was modified again in 1980 in the face of a possible transit shutdown: Chapter 581 of the Acts of 1980 prohibited the MBTA from bargaining collectively or agreeing with the Union on issues related to certain “inherent management rights.” G.L.c. 161A, §25 (formerly G.L.c. 161A, §19).
Several provisions of Chapter 161A are relevant to the issues before this Court and define the scope of my review. Of particular importance is Section 32, which imposes certain limitations on the interest arbitrator’s authority. First, the arbitrator is confined to choosing between the Last Best Offers of the parties on any issue, or anything in between. Second, the arbitrator must issue a written opinion within thirty days of an award which includes analysis of certain factors set forth in G.L.c. 161A §31. Section 31 sets forth seven factors, as well as one catchall provision. Finally, the scope of the arbitration “shall be limited *85 to wages, hours, and conditions of employment ...” G.L.c. 161A, §32; see also G.L.c. 161A, §25. This last limitation has real teeth: in the only reported Massachusetts case concerning an interest arbitration, the SJC affirmed the trial court’s refusal to enforce those provisions of an award that dealt with matters reserved for management, since that was statutorily removed from the arbitrator’s authority to decide. See Local 589 Amalgamated Transit Union, AFL-CIO, CLC v. MBTA, 392 Mass. 407, 416-17 (1984) (“Local 589”).
Once the arbitrator renders her decision, the statute provides that it “shall be binding upon the parties” and may be enforced by either party so long as it is “supported by material and substantial evidence on the record...” G.L.c. 161A, §32. This brings the Court to the first point of contention between the parties: the Union argues that procedurally, this entire action is not properly before me because the MBTA seeks not to enforce the award but to vacate it, a remedy found nowhere in Chapter 161 A.[2] The Union argues that this omission in the statute is significant: if interest arbitration is an extension of collective bargaining, then a party unhappy with an award should first attempt to negotiate a resolution rather than run to court and immediately mire the parties in litigation. It is only after a party refuses to abide by an award or to negotiate further that an action of enforcement by the other party should take place.
The MBTA responds by noting — correctly—that whether an arbitrator has acted beyond the scope of her authority is (as the SJC has held) “always open to judicial review.” Local 589 v. MBTA, 392 Mass. at 410-11. But analogizing the instant case to the scenario before the SJC in Local 589 is like comparing apples to oranges. Here, there is no dispute that the issues that the arbitrator decided were all within her power to determine. In contrast, in the Local 589 case, the arbitrator decided matters that the Legislature had expressly removed from his consideration. Of course, the Union’s procedural objection notwithstanding, the fact remains that the Union has now itself moved to enforce the Award, taking the MBTA’s institution of this lawsuit as the equivalent of refusing to abide by the terms of the Award. The case is therefore properly within my jurisdiction to decide.
The MBTA argues that this Court should decline to enforce the Award because the arbitrator failed to apply the factors set forth in G.L.c. 161A, §31, and did not rely on substantial evidence in making her decision. The statutory factors will be discussed more thoroughly in the context of the merits. The more interesting question is what kind of review is required for this Court to be convinced that this Award is supported by “material and substantial evidence.”
B. Substantial Evidence
Section 32 of G.L.c. 161A does not define the term “substantial evidence.” Two principles of statutory construction inform this Court’s interpretation of that term. First, where a statutory term is not defined, “it must be understood in accordance with its generally accepted plain meaning.” Allen v. Boston Redevelopment Auth., 450 Mass. 242, 256 (2007). Second, the Legislature must be assumed to know the preexisting law, including decisions by the courts, and thus enacts a statute with that legal background in mind. Worcester v. College Hill. Props., LLC, 465 Mass. 134, 139 (2013) (citation omitted).
The Legislature has defined the term “substantial evidence” in the context of the Administrative Procedure Act, G.L.c. 30A (the APA), the vehicle by which agency decisions may be judicially reviewed. As stated in G.L.c. 30A, §1(6), “substantial evidence” is “such evidence as a reasonable mind might accept as adequate to support a conclusion.” See also Worcester v. College Hill Props., LLC, 465 Mass. at 139. This definition calls for some judicial deference to the original decision maker: “a reviewing court is not empowered to make a de novo determination of the facts, to make different credibility choices, or to draw different inferences from the facts found by the [agency].” Doherty v. Retirement Bd. of Medford, 425 Mass. 130, 135 (1997), quoting Medi-Cab of Mass. Bay, Inc. v. Rate Setting Comm’n, 401 Mass. 357, 369 (1987). Where the evidence could reasonably support conflicting conclusions, it is up to the agency, not the Court, to resolve the conflict. Doherty v. Retirement Bd. of Medford, 425 Mass. at 141-42. Particularly in those areas which require some expertise, the court must give due weight to the decision maker’s experience, technical competence, and specialized knowledge, as well as the discretionary authority conferred upon the agency by statute. G.L.c. 30A, §14(7); see also Flint v. Comm’r of Pub. Welfare, 412 Mass. 416, 420 (1992). In short, an administrative agency’s “findings and decision... are to be sustained wherever possible and . . . are not be reversed unless they are wholly lacking in evidentiary support or are tainted by errors of law.” Sweeney’s Case, 3 Mass.App.Ct. 284, 286-87 (1975).
The Union argues that the standard that should be applied to assessing the factual sufficiency of an interest arbitration award should be even more deferential, for a three reasons. First, G.L.c. 161A is quite different from Chapter 30A in defining the scope of judicial review. For example, G.L.c. 30A, §14(7) lists seven separate bases for challenging an agency determination, and a party aggrieved by the determination may institute a court action to vacate it. Chapter 161A in contrast states only that the arbitrator’s decision is “binding” and permits a party to go to court only to enforce the decision. G.L.c. 161A, §32. It is only in the context of this enforcement action that a court determines whether the evidence in support of the Award is “material and substantial.” Second, an agency proceeding is essentially an adjudicatoiy one, whereas (as already discussed) an interest arbitration is more an extension of the collective bargaining process, and is *86 therefore more dynamic and fluid. Chapter 161A recognized the need for some special expertise by requiring that the arbitrator have some background in public finance. Moreover, the arbitrator is chosen by the parties, and presumably they select someone who is familiar with the workplace and more particularly the relationship between labor and management. Finally, a 30A challenge necessarily requires the filing of the entire record, which the court must review before rendering its decision. In the instant case, this Court has only a small portion of the record (that part that the MBTA cites in support of its factual positions). To require a detailed and thorough examination of the transcript from 22 days of hearings would necessarily delay these proceedings for months — an outcome that the MBTA itself decries.[3]
Whether Chapter 161A’s definition of substantial evidence is any different from that under Chapter 30A may be important in some future case, but as it turns out, not in the one before this Court. That is because this Court is convinced that the arbitrator’s decision is supported by “material and substantial evidence” using the 30A definition. I reach that conclusion, however, without reviewing the transcript from the 22 days of hearing or the exhibits that were presented.[4] The arbitrator’s decision outlines the testimony and other evidence presented by both parties, concisely summarizes each side’s argument, and then explains why she reached the conclusion that she did. The MBTA does not claim that she somehow misstated the evidence or (hyperbole aside) that she totally ignored certain data. There is no allegation that she excluded evidence or unfairly constrained the MBTA in the presentation of its case. Rather, the MBTA takes issue with the weight that the arbitrator gave to certain evidence and the adequacy of her analysis. Even under 30A, however, this would not be ground for overturning the Award.
C. The Particular Challenges
As noted above, the MBTA challenges three determinations of the arbitrator. They relate to wages, the Trust, and the Rollover Clause. Each issue will be discussed separately.
1. Wages
The MBTA challenges the arbitrator’s Award of a ten percent total wage increase over four years (that is, retroactive back to July 1, 2010). This fell between the Last Best Offer of both sides and thus complied with G.L.c. 161A, §32. In challenging this award, the MBTA argues that the arbitrator failed to apply the statutory factors set forth in G.L.c. 161A, §31. This Court disagrees.
It is important to note at the outset that Section 31 is written in a way which manifests a legislative intent to give the arbitrator some flexibility even as it provides criteria to guide her. Thus, it begins by stating that the arbitrator shall rely “primarily” on the factors Section 31 sets forth. (Emphasis added.) Even more important, the statute contains a catchall provision which permits the arbitrator to consider any other factors “which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through collective bargaining, mediation, fact finding, arbitration or otherwise between the parties” so long as it is not otherwise precluded by G.L.c. 161A, §25 (concerning management rights). G.L.c. 161A, §31(h).
The MBTA argues, first, that the arbitrator “did not adequately consider” G.L.c. 161A, §31(a) — more particularly, a subset of that subsection concerning the MBTA’s financial ability to pay. But the arbitrator did consider the MBTA’s financial situation, acknowledging that “the parties are in startling agreement regarding the state of MBTA finances, which they both portray as having been in recent years mired in debt.” Award, at 44. The arbitrator noted that the recent passage of the Transportation Finance Bill, St. 2013 c. 46, will provide some financial assistance, although that “does not take the pressure off of the [MBTA] to find efficiencies and cost savings wherever it can.” Award, at 45-46 (footnote omitted). Ultimately, the arbitrator concluded that the MBTA is “always underfunded” and that “everything is unaffordable in a deficit situation . . .” Award, at 47. Because it still depends on its workforce as much as its equipment to meet ridership needs and that workforce must be paid, then simply to state that the MBTA is running a deficit is not alone sufficient to decide the wage issue: the other “objective criteria” of Section 31 must be consulted, “chiefly, comparability within the Commonwealth and in the transit industry and changes in the cost of living.” Id. That the arbitrator did not attach more weight to the MBTA’s financial ability to pay is not grounds for overturning her decision. It was hardly a “complete abdication of her statutory duty,” as the MBTA argues in its papers.
The MBTA next takes issue with the fact that the arbitrator considered wages of comparable transit employees outside of Massachusetts, noting that G.L.c. 161A, §31(e) expressly states that the relevant comparison is to those employees performing similar services within the Commonwealth. There are two problems with this argument. First, G.L.c. 161A, §31(h) allows the arbitrator to consider other factors which have historically been applied in collective bargaining between the parties; the arbitrator pointed out that earlier arbitrators had indeed looked to wages of transit employees outside the state. Second, the arbitrator did in fact consider §31(e), noting that it suggested a legislative intent “to deemphasize other large urban transit systems and force more emphasis on the local economy . . .” Award, at 47. She also considered the evidence that the MBTA presented on that issue. She noted, however, that the some of the public sector positions that the MBTA used as “comparables” are not comparable at all. She was also of the opinion that what was of even greater importance was the pattern *87 that had developed over a long series of negotiated agreements and interest arbitrations between the parties: although there was a substantial gap between the wages of Local 589 employees and those designated comparable employees within the state, the ratio between the two groups had remained fairly steady. “With this in mind, I have attempted to award wage adjustments that do not significantly disrupt that historical ratio.” Award, at 53. Reasonable minds may differ as to the wisdom of that conclusion, but that is not the question.[5]
Finally, the MBTA argues that the arbitrator did not offset any wage increase by the financial benefit Union members enjoyed as a result of the delay shifting them out of their current health plans and into the GIC. Again, it is not that the arbitrator failed to consider this argument: she did, but ultimately determined that a dollar-for-dollar offset was not appropriate. As she stated: “I do not share the Authority’s opinion that this delay was brought about by a cynical desire to delay” executing a new CBA or to “forestall increases in health care costs associated with GIC migration.” Award, at 62. She continued: ‘The Union believed (it turned out correctly) that the legislation deprived its membership of their collective bargaining rights and pursued options under its 13(c) agreement [before the Department of Labor] in an effort to preserve those rights.” Id. Even then, the arbitrator did not simply ignore the benefit of the delayed migration, stating that “it warrants consideration, albeit not to the level suggested by the Authority.” Id. The MBTA may not be happy with this outcome, but it is legally and factually supportable.
2. Trust
The MBTA attacks three rulings the arbitrator made with respect to the Trust, specifically her decisions to extend the Trust to retirees, to award retirees Medicare B reimbursements, and to include life insurance within the Trust’s benefits. As the Union correctly notes in its Reply Memorandum, the MBTA appears in this part of its argument to have dropped any pretense of claiming that the arbitrator exceeded her authority or rendered a wholly unsupportable decision. Thus, it does not assert that the law prohibited her from including retirees, only that she should not have done so. It does not argue that life insurance could not have been included in the trust, only that it should not have been. It says that awarding retirees Medicare Part B reimbursements is “improper” but cites only “public policy” and a disagreement between the parties as to the interpretation of a provision in the old CBA which arguably did cover such reimbursements. None of these arguments come close to providing a basis for vacating the Award.
3. Rollover Clause
The MBTA challenges the Arbitrator’s rejection of its request that she delete a Rollover Clause from the new collective bargaining agreement. Its argument is essentially one of “public policy.” Just as it did in its post-arbitration brief, the MBTA maintains that a Rollover Clause empowers the Union to delay the implementation of changes with which it does not agree, resulting in a constant cycle of contract negotiations. The arbitrator acknowledged that the negotiation of a new CBA and the interest arbitration of disputes related to it have been a protracted, even “laborious” process, but that was not attributable to the Union alone. Award, at 87-88. She also discussed the policy reasons for maintaining a rollover clause: it provides stability during this process “while the statutorily-mandated method of dispute resolution works its way to finality.” Award, at 88. Whether the arbitrator’s policy choice was the correct one or not is irrelevant, since that choice is not subject to judicial review.
D. The MBTA’s Request for Declaratory Relief and the Union’s Request for Injunction
Immediately after the Award issued and this lawsuit was filed, the MBTA sent out notices to its employees that migration to the GIC would take place on January 1, 2014. The Union took the position that this migration could take place only with a new CBA in place: if the MBTA was challenging the Award — which set the terms for that new agreement — then as a result of the rollover clause in the old CBA, the terms of the old agreement remained in effect, so that a switch in benefits was contractually barred. In response, the MBTA in an Amended Complaint added Count II which asked this Court to declare that, notwithstanding the rollover clause, Section 140 of Chapter 25 required migration to the GIC on the “expiration date” of the any existing CBA. It maintained that the expiration date for the old CBA with the Union was July 10, 2010.[6]
At the oral argument on these motions, this Court was informed that the transfer will not take place on January 1, 2014 but that employees will continue to receive their current benefits “until further notice.” Presumably, this was to give the Court the time necessary to render its decision, since the hearing was held December 16, 2013. In any event, the Union sought an injunction only in the event this Court was to vacate the award or delay in issuing a decision. Given this Court’s decision to enforce the Award, injunctive relief becomes unnecessary.
As to the MBTA’s request for declaratory relief, it maintained at oral arguments on these motions that I decide Count II even if I determine that the Award should be confirmed. Chapter 231A §1 authorizes declaratory relief only if an “actual controversy has arisen,” however. With the Award in effect, migration can occur at any time of the MBTA’s choosing. Its right to do so is unaffected by any decision this Court might render on Count II. See Bonan v. Boston, 398 Mass. 315, 320 (1996) (plaintiff had no standing to seek declaratory relief where a ruling would have no impact *88 on its rights or obligations). The MBTA argues that, in the event it decides to appeal this Court’s decision, it must have a definitive ruling as to whether it can proceed with the transition to the GIC in the interim. That presupposes that there will be an appeal. Even if that happens, it will be up to the MBTA to figure out what to do from there. See Mass.R.App.P. 6(a).
CONCLUSION AND ORDER
For all the foregoing reasons, the MBTA’s Motion to Vacate the Arbitration Award is DENIED and the Union’s Motion to Confirm the Award is ALLOWED. It is hereby ORDERED that, as to Count I of the Amended Complaint, judgment enter Confirming the Award dated August 26, 2013. As to Count II, it is DISMISSED.

 Section 13(c) of the Urban Mass Transportation Act requires as a condition of receiving federal funds that the state must assure the Secretary of Labor that fair and equitable arrangements have been made to protect, among other things, the collective bargaining rights of employees affected by such funds.

This Court agrees with the Union that Chapter 150C, pursuant to which the original Complaint was filed, is not the proper statutory vehicle for review of an interest arbitration award.

The migration to the GIC, which will result in some cost savings to the MBTA, arguably should occur only if the Award is confirmed: without an Award in place, the terms of the old CBA remain in effect, and those terms determine health care benefits, among other things.

Although the MBTA has presented some exhibits and some selected portions of the transcript, to review these alone would not be fair, since they tell only one side of the story.

The MBTA argues that this conclusion also rests on the false premise that Local 589 essentially sets the pattern for other unions when it comes time for them to negotiate then-own collective bargaining agreements. It maintains that the Union has not been the “pattern setter" for the last few years in light of the legislative changes in the health care benefits and the way that other unions have responded to those changes. This Court fails to see how this argument provides any traction for the MBTA’s position that this Award must be vacated. Indeed, pattern bargaining, who sets the pattern and what significance that has are precisely the kind of details within the special expertise of the arbitrator to assess.

The MBTA did not appear to be of this view while negotiations and the interest arbitration were ongoing: during the three and half years since July 2010, it conducted its affairs under the terms of the old CBA and consequently did not take any steps to order Union employees to shift to the GIC.